E-FILED
Friday, 16 September, 2022  11:50:45 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 22-2197 |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF ILLINOIS | ) | |
| | ) | |
| Defendant. | ) | |

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

NOW COMES the Plaintiff, JOHN DOE[1], by and through his attorneys, Meyer Capel, A

Professional Corporation, and for his cause of action against the Defendant, Board of Trustees of

the University of Illinois ("The Board"), states as follows:

### Nature of the Action

1.     This is an action for declaratory and injunctive relief and for damages

arising out of the decision of The Board to separate Plaintiff, John Doe, from the

University of Illinois at Urbana-Champaign ("The University") without a proper hearing

in violation of the due process rights afforded to Plaintiff by the Fourteenth Amendment

to the United States Constitution.  The case arises out of the actions taken and procedures

employed by The Board, concerning false and unsubstantiated allegations of non-

consensual sexual assault made against the Plaintiff, an undergraduate student.

2.     The allegations underlying the actions taken by Defendant concern

purported sexual activity that occurred on or about February 14, 2020 between Plaintiff

and Jane Roe, a fellow student at The University.

---

[1] Plaintiff is contemporaneously filing a motion for permission to proceed under pseudonym.  Plaintiff is entitled to proceed anonymously because of the highly sensitive nature of the disciplinary proceedings against him that form the basis of this complaint, and the fact that The University of fully aware of his identity and will not be prejudiced in any way.  Plaintiff also seeks to maintain the privacy rights of his accuser by requesting permission to identify her anonymously as "Jane Roe."

3.      After John Doe applied to and was accepted by The University, he was provided copies of The University's Student Code, policy on sexual misconduct, and its student disciplinary procedures, which are available on The University's website.  The aforementioned documents are Defendant's representations and covenants to Plaintiff, which provide a property right in his education and degree from The University as well as a liberty interest in his good name and reputation that may not be taken by a governmental actor, such as the Defendant, without the due process afforded by the United States Constitution.

4.      The aforementioned documents do not allow the Defendant to deny or diminish John Doe's due process rights in liberty and property.

5.      In exchange for these covenants, and in reliance on the documents and the conditional promise of a degree, John Doe agreed to complete coursework necessary to earn his degree, pay his tuition and other expenses owed to The University, and abide by The University's written policies, thereby forming an express and/or implied contract between The Board and John Doe.

6.      That after being accepted to The University and undertaking courses at The University, John Doe received notice on or about February 27, 2020 that he was the subject of a sexual assault charge.  John Doe met with investigators from The University, including Debra Imel, on or about March 26, 2020 for an interview.

7.      Investigators were authorized by Defendant to have total control over the investigation and the resulting investigative report, which would be submitted to the subcommittee on sexual misconduct established by The University for a decision on whether John Doe violated the student code and if so, appropriate sanctions.  The investigators conducted some witness interviews.  The University ultimately obtained electronic communications, video evidence, medical documentation, and information supplied by law enforcement.

2

8.      Both John Doe and Jane Roe were permitted to review the evidence, provide comments to clarify, and submit follow-up questions for the investigators to ask the other party.

9.      Ultimately, a final report was issued and submitted to the subcommittee on sexual misconduct ("The Subcommittee"), which was held on or about August 19, 2020. John Doe was not allowed to cross-examine adverse witnesses and was not allowed to confront his accuser.

10.     Instead, based on the investigators' report and documents, and some witnesses, The Subcommittee determined that, after consuming alcohol together at KAMS, John Doe walked Jane Roe to his apartment. While there, the two went into his bedroom and she asked John Doe for a shirt. The Subcommittee found that she told John Doe that she wanted to go to bed. The Subcommittee further found that Jane Roe asked the Plaintiff if he had a condom and he answered that he did not. The Subcommittee found that she indicated she did not think the two of them should "do this," nevertheless, Plaintiff had sex with Jane Roe. The Subcommittee found that the Plaintiff did not have Jane Roe's consent to do so, and after ceasing intercourse, he asked Jane Roe to perform oral sex, which she did.

11.     Based upon the foregoing, The Subcommittee found that John Doe violated Sections 1-302.b.2, 1-302.b.1, and 1-302.a.2 of the student code.

12.     That in issuing its rationale for the finding, The Subcommittee found that Doe did not obtain consent from Jane Roe to engage in sexual intercourse. Doe was dismissed from the school and advised that he could petition for readmission after two years, and after completing a number of sanctions, including submitting evidence of successful academic work at another institution and/or work history; write a 3,000-word research paper on sexual consent; was issued a no-trespass order for two years; and was issued a no-contact directive with Jane Roe.

3

13.     In reaching its conclusions, The Subcommittee specifically found that it was unable to question Jane Roe directly, but relied on the record of the case to evaluate her credibility.  The Subcommittee further found that based on an examination of the material and testimony provided, and after an application of the preponderance of the evidence standard, it found Jane Roe's narrative more credible than that of John Doe, even though she did not testify before The Subcommittee.

14.     John Doe appealed the decision of The Subcommittee to the Senate Committee on Student Discipline.  On September 18, 2020, the Senate Committee on Student Discipline met regarding John Doe's appeal of the decision of The Subcommittee.  John Doe was not permitted to submit any additional evidence, but to simply submit a checklist regarding issues to raise regarding the appeal.

15.     The Senate Committee concluded, after an examination of the written appeal and the record of the case, that none of the criteria for appeal were substantially met.  They found no evidence of bias, conflicts of interest, new information, or procedural error.  They did find that the investigation took longer than is typical, but found that based upon allegations raised by John Doe regarding an incident involving a third party, the investigator had to look into that matter as well.

16.     The Senate Committee affirmed The Subcommittee's original decision and adopted the finding of The Subcommittee, resulting in the violations of the student code being upheld and the decision being final.  Again, John Doe was dismissed from The University of Illinois at Urbana-Champaign effective September 18, 2020, with the notation that dismissal records are maintained indefinitely and are noted on his transcript. It was further noted that he was prohibited from attending or receiving a degree from The University until he successfully petitioned The Subcommittee to pursue readmission, and adopted the conditions set forth by The Subcommittee.

17.     Neither hearing before The Subcommittee or the Senate Committee was constitutionally sufficient as the finders of fact did not hear testimony from Jane Roe. Plaintiff was not permitted to cross-examine Jane Roe or any adverse witnesses.

18.     Plaintiff was not afforded the opportunity to present his testimony or evidence to The Subcommittee or Senate Committee in a manner that would assist The Subcommittee in determining the creditability of either party.  In fact, The Committee found that it was unfortunate that they were unable to question Jane Roe directly but believed that the record of the case gave them enough information to validate the credibility of her narrative objectively and ruled on her credibility without her being present for the hearing.

19.     That at all times relevant since Plaintiff's dismissal, Plaintiff has had to offer explanations for his dismissal from The University, and the dismissal remains upon his transcript from The University indefinitely.  Defendant's actions permanently damaged Plaintiff's good name and reputation.  These property and/or liberty interests have been or continue to be taken from Plaintiff without a fair hearing, including the opportunity to cross-examine adverse witnesses, and to require the complainant, Jane Roe, to testify and allow Plaintiff to cross-examine her.  The hearing process is devoid of basic fairness and is contrary to Plaintiff's constitutionally protected due process rights.

20.     Plaintiff will be forced to explain, for the remainder of his professional life, why he was dismissed from The University.

21.     For these reasons, Plaintiff brings this action to obtain injunctive and declaratory relief, and attorney's fees and costs against The University for violating due process afforded by Plaintiff's Fourteenth Amendment right.

## Jurisdiction

22.     This Court has jurisdiction pursuant to 28 U.S.C. 1331, 28 U.S.C. 1343, 42 U.S.C. 1983 and 1988, and the Fourteenth Amendment to the Constitution of the United States of America.

## Venue

23.     Venue is appropriate under 28 U.S.C. 1391(b).

## Parties

24.     Plaintiff, John Doe, is a natural person who resides in the State of Illinois. At the time of the alleged sexual misconduct, John Doe was enrolled as a full-time tuition-paying undergraduate student at The University.

25.     When Defendant as a body corporate and politic having power to plea and be impleaded, to make and establish bylaws, and to alter or repeal the same as they deem necessary, for the management or government, in all its various departments and relations of the University of Illinois, for the organization and endowment.  The Board is sued in each and every cause of action, in any and all capacities.

## Factual Allegations

26.     Plaintiff and Jane Roe met in the fall semester of 2019 at The University. Jane Roe was an undergraduate student at The University.

27.     That Plaintiff and Jane Roe were members of an athletic team within the Division of Intercollegiate Athletics.

28.     On the night of February 14, 2020, Plaintiff and Jane Roe spent time at KAMS where they each consumed alcoholic beverages.  Jane Roe consumed several drinks on the night in question.

29.     Plaintiff and Jane Roe left KAMS, and Plaintiff walked Jane Roe to his apartment.

30.     While at the apartment, Plaintiff and Jane Roe went into Plaintiff's bedroom.  Jane Roe asked Plaintiff for a shirt and told Plaintiff that she wanted to go to bed.

31.     After Jane Roe got into bed, Plaintiff began to kiss her.  Jane Roe asked Plaintiff if he had a condom, and he responded that he did not.  Jane Roe told Plaintiff that while she was not comfortable with him not having a condom, she agreed to continue without one, and told Plaintiff to be careful.

32.     Jane Roe also made a joke about Plaintiff buying her Plan B the following day.

33.     After the parties ceased sexual intercourse, Plaintiff asked Jane Roe to perform oral sex on him, which she did.

34.     Thereafter, Jane Roe left Plaintiff's apartment and then reported the incident to the police and sought medical evaluation.

35.     That at no time did Plaintiff engage in non-consensual sexual intercourse or behavior with Jane Roe, and in fact, Jane Roe either verbalized consent or exhibited non-verbal indications of consent during each sexual encounter.

**The University's Sexual Misconduct Policy and Student Conduct Protocol for Allegations of Sexual Misconduct**

**1. The University's Sexual Misconduct Policy**

36.     At the time of Jane Roe's complaint against Plaintiff in February of 2020, Defendant's policy on sexual misconduct ("Policy") supplied the definition of sexual assault and consent which were applied to the charges against John Doe.

37.     Defendant incorporates definitions and terms of the Policy and its student code ("Code") found at studentcode.illinois.edu, contained on The University website.  A copy of the relevant portions of the student Code is attached hereto, marked "Exhibit A," and fully incorporated herein.

38.     The Code includes the Defendant's basis for discipline, source, and jurisdiction.  The Code details that the Defendant provides the authority to the Senate Committee on student discipline to be responsible for the administration of student discipline for acts involving violations of campus or University regulations.

39.     The Code further details that the basis for discipline at this campus be clearly defined.

40.     The Code provided for "rules of conduct" in which students are subject to discipline and includes examples of conduct that violates The University's Policy, including sexual assault.

41.     The Policy defines "sexual misconduct" to include "sexual assault."  The Policy further defines under Section 1-111(c)(2)(a-b), "sexual assault" as "any sexual conduct that does not involve the willing consent of each person, including any form of sexual penetration without consent; and any intentional or knowing touching of fondling by either person, directly or through clothing, of the sex organs, buttocks, or breasts of the other person for the purpose of sexual gratification or arousal of either person without consent."

42.     The Policy defines "consent" as follows:  "Consent is informed, freely, and actively given, mutually understandable words or actions that indicate a willingness to participate in mutually agreed upon sexual activity.  A person can withdraw consent at any time.  There is no consent when there is force, threats, intimidation, or duress.  A person's lack of verbal or a physical resistance or manner of dress does not constitute consent.  Consent to past sexual activity with another person does not constitute consent to future sexual activity with that person.  Consent to engage in sexual activity with one person does not constitute consent to engage in sexual activity with another person.  A person cannot consent to sexual activity if such person is unable to understand the nature, fact, or extent of the activity or give willing consent due to circumstances, including,

without limitation, the following:  (A) the person is incapacitated due to the use or influence of alcohol or drugs."

### 2.  The University Student Conduct Protocol for Allegations of Sexual Misconduct

43.     When a student violates the community standards outlined in the Code, the Office for Student Conflict Resolution ("OSCR") has the responsibility of administering the student disciplinary procedures.

44.     The Defendant's OSCR provides for "student disciplinary procedures" on the website www.conflictresolution.illinois.edu/student-discipline.

45.     The OSCR addresses all behavior violations of the Code committee by individuals.

46.     Appendix D provisions of the Student Disciplinary Procedures apply to cases that include an accusation of sexual misconduct, including sexual assault. Appendix D defines, and also outlines, the procedures and protocols for "allegations of sexual misconduct, including sexual harassment, sexual assault, sexual exploitation, stalking, dating violence and domestic violence."  A copy of Appendix D is attached hereto, marked "Exhibit B," and fully incorporated herein.

47.     Section 1 provides the definitions for various terms within Appendix D. Section 1 defines "subcommittee on sexual misconduct" as "the group of faculty, staff, and students trained to adjudicate cases that include allegations of sexual misconduct, including sexual harassment, sexual assault, sexual exploitation, stalking, dating violence, and domestic violence.  The group is selected by OSCR staff and approved by The University.

48.     Section 4 of Appendix D provides for the investigation process and procedures.

49.     Section 4(a) of the Appendix provides for "intake and review."  Pursuant to Section 2(a), OSCR oversees the investigations of allegations against students.  Once

notified of the allegations covered by "Appendix D," the Director will assign an investigator to conduct the investigation.  This assigned investigator may be assisted by other investigators as necessary.  The assigned investigator will first attempt to interview the complainant to determine the precise nature of the allegations.

50.     After the assigned investigator determines whether the allegations, if substantiated, would violate the student Code, a charge notice is issued pursuant to Section 4(a).  The written charge notice informs the respondent of the approximate date, time, place, and type of incident as well as the sections of the student Code that respondent is alleged to have violated.

51.     After the new written charge notice is issued, the assigned lead investigator proceeds to interview the respondent pursuant to Section 4(c).

52.     Section 4(d) provides for information collection and witness interviews. Section 2(d) states, in part, that the respondent and the complainant will be given the opportunity to provide supporting information and documentation and to identify witnesses.  The lead investigator then reviews all submitted materials.

53.     Section 4(e) of Appendix D provides for follow-up interviews.

54.     Section 4(f) provides for updates which requires OSCR to provide both the respondent and the complainant with periodic status updates during the investigation, the adjudication process, and the appeals process.

55.     Section 4(h) provides "timeline."  This section anticipates a duration of an investigation to be approximately 45 calendar days following the charge notice.  Further, if the duration of an investigation will substantially exceed this estimate, the lead investigator will provide written notice to both the respondent and the complainant of the delay and the reason for the delay.

56.     Section 6 provides for the investigative report.

57.     Section 4(c) provides that the investigator will attempt to interview the respondent in a timely manner.  Section 4(d) provides that the respondent and the

complainant will be given the opportunity to provide supporting information and documentation and to identify witnesses.  The investigator will review all submitted materials and attempt to interview all witnesses.  The investigator may seek additional information, documentation or witnesses from other sources.  Section 4(e) provides that the investigator may request additional meetings with the respondent and complainant to discuss any information gathered during the investigation.

58.     Section 5(a) provides for a report review.  This section allows for any respondent and complainant the opportunity to review the initial investigative report in OSCR during normal business hours and to submit a written response.

59.     Section 6(b) provides for the final review and response stating, in part, that the respondent and complainant will be given five business days to review the revised report at OSCR during normal business hours and to submit a final written response which may also include impact statements, character statements, statements of desired outcome, and any other information believed relevant for sanction determination.

60.     Section 6(a) provides that if the evaluation does not result in the closure of the case, the investigator will create an investigative report that fairly summarizes the investigation and the evidence.

61.     Section 6(b) provides that the investigator will provide an electronic copy of the investigative report to both the respondent and the complainant and notify them that they may submit a written response no later than five business days after the report has been sent.

62.     Section 7 provides for a formal hearing.

63.     Section 7(a) provides for the appointment of panel.  Section 7(a) provides for the executive director to appoint a panel composed of three members of The Subcommittee, pool of trained University faculty, students, and staff members.  Before membership of this panel is finalized, OSCR provides both the respondent and complainant with a list of all members of The Subcommittee.  The respondent and

complaint may challenge the objectivity of any panel person. At least one faculty member and one student must be appointed to each panel, and then the voting panel members will select a faculty member to serve as chair.

64.     Section 7(c) provides for scheduling of an administrative hearing before the Panel.

65.     Section 7(a) further provides the prior to serving on a Panel, all Panel members will have received appropriate annual training, developed in consultation with The University's Title IX coordinator, on sexual harassment, sexual assault, sexual exploitation, stalking, dating violence, domestic violence, and the physiological and psychological effects of trauma. Section 7(b) provides for Panel review of the investigative report. Section 7(b) states that Panel members will have five business days to review the final investigative report over which the investigators have final control.

66.     That a hearing was provided for the complainant and the respondent, however, the complainant failed to appear at the hearing and deprived the respondent of any ability to cross-examine her, even through questions directed to The Subcommittee.

67.     Section 7(e) sets forth hearing rules. Section 7(e)(8) provides that the Executive Director or their designee will advise the Panel and may participate in questioning and deliberation, but they may not vote. The investigator may not serve in this role. The investigator is to be present during the hearing but will leave the hearing room during the deliberation. Neither the complainant nor the respondent are allowed to question or otherwise address each other or any witness directly, but can suggest questions to be posed by the Panel chair who may choose not to ask a question if it has already been answered, is irrelevant, or inappropriate.

68.     Section 7(f)(10) provides that after the information is presented, the Panel chair will excuse the complainant, the respondent, and the investigator from the room and will enter into closed deliberation to find facts and determine responsibility. The Panel will make its decisions by simple majority rule and apply the preponderance standard.

69.     Section 7(g) provides for "Sanctions."  Section 7(g)(1) provides that the Panel will propose a rationale for their sanctioning decision.

70.     Section 7(h) provides for "Notice of Action Taken."  Section 7(h) further provides that OSCR staff will provide email notification of the Panel's decision, including a rationale, to both the respondent and the complainant as soon as possible, usually by the next business day.  This notification will also include information regarding the parties' right to appeal the Panel's decision.

71.     Section 8 provides for the "Appeal Procedures."

### 3.  The Agreements between Defendant and John Doe

72.     Plaintiff applied and was accepted to the University's class of 2018.

73.     Upon Plaintiff's acceptance to the University, the Defendant provided Plaintiff copies of its school policies, including the Code, Policy, Appendix D, and the Student Disciplinary Procedures of which are available on the University's website. These Defendant policies set forth the procedures by which students who have been accused of violating one or more of the enumerated policies are investigated, heard, and possibly, disciplined.

74.     Prior to accepting the offer for enrollment, John Doe reviewed the policies, in whole or in part.  While enrolled at the University, Plaintiff reviewed the policies in whole or in part.

75.     The Code provides the following Preamble, §1-101:

a.     A student at the University of Illinois at the Urbana-Champaign campus is a member of a University community of which all members *have at least the rights and responsibilities common to all citizens, free from institutional censorship; affiliation with the University as a student does not diminish the rights or responsibilities held by a student* or any other community member as a citizen of larger communities of the state, the nation, and the world. (Emphasis added).

b.     Any rules or regulations considered necessary to govern the interaction of the members of the University community are intended to reflect

values that community members must share in common if the purpose of the community to advance education and to enhance the educational development of students is to be fulfilled. These values include the freedom to learn, free and open expression within limits that do not interfere with the rights of others, free and disinterested inquiry, intellectual honesty, sustained and independent search for truth, the exercise of critical judgment, respect for the dignity of others, and personal and institutional openness to constructive change. *The following enumeration of rights shall not be construed to deny or disparage other rights retained by these individuals in their capacity as members of the campus community or as citizens of the community at large.* (Emphasis added).

76.     The Code does not allow the Defendant to deny Plaintiff's Due Process rights in liberty and property to learn as a student and a citizen of the community at large. Further the Code does not allow the Defendant to even diminish the Due Process rights held by a student or a citizen of the community. The freedom to learn is a right to continuing education that cannot be taken by government without Due Process.

77.     The Code provides the following Privacy Rights, §1-104, in relevant part: "(a) Members of the University community have the same rights of privacy as other citizens and surrender none of those rights by becoming members of the academic community ... ". The right to privacy is a liberty right protected by Due Process of the Fourteenth Amendment to the U.S. Constitution. See Exhibit "A."

78.     The Student Disciplinary Procedures Section 1.01 - History, provides and represents in relevant part, "The Trustees asserted their belief in the concept that the University discipline system shall be separate from, but coexistent with general systems established by society to deal with the conduct of citizens of society." The general systems established by society when being accused of rape is to provide a formal hearing for the accused, to allow the accused to confront his accusers during the hearing and to allow an attorney to represent the accused at that hearing. The procedures in Appendix D are not consistent with general systems established by society when someone is accused of rape. The procedures do not afford the constitutional minimum of a right of the

accused to attend a hearing, to testify at that hearing and to confront or cross-examine his accusers and to be represented by an attorney.

79.     The Student Disciplinary Procedures Section 1.02 - Philosophy, provides and represents in relevant part "The community supports each member's right to study and work in a quiet, respectful, non-violent atmosphere that is conducive to the pursuit and acquisition of knowledge." The right to study is a right to continuing education that cannot be taken by government without Due Process.

80.     The Student Disciplinary Procedures Section 1.04 - Nature of System, provides and represents in relevant part, "Our disciplinary system is not intended to be adversarial in nature and is substantially less formal than a court of law. The majority of cases, in which severe sanctions are not likely to be considered, can and should be handled informally." Therefore, the converse is also true; i.e., in a case in which severe sanctions are likely to be considered, such as being expelled from the University because of a claim of rape, can and should be handled formally. A formal procedure requires, at minimum, the right of the accused to attend a hearing, to testify at that hearing, to confront his accusers at the hearing and to be represented by counsel.

81.     The Code, Policy, Appendix D, and the Student Disciplinary Procedures afforded rights to Plaintiff in a property right in continuing education, his degree and diploma, and a protected liberty interest in good name and reputation.

82.     Defendant represented to Plaintiff through its Code, Policy, appendix D, and the Student Disciplinary Procedures that Plaintiffs property right to education, learning, and studying would not be dismissed from the University without following its specified procedures. The Defendant further represented that his Due Process rights would not be denied or diminished.

83.     Plaintiff accepted these aforementioned representations and covenants from Defendant and paid his tuition to Defendant while a student at the University. An

15

agreement and implied contract was formed between Plaintiff and Defendant to not dismiss Plaintiff from the University without Due Process.

84.    The agreements, representations, and covenants between Plaintiff and Defendant do not disclaim that the Code, Policy, Appendix D, and the Student Disciplinary Procedures do not form an express or implied contract between John and Defendant.

## COUNT I

**Violation of the Due Process Clause of the 14th Amendment to the
United States Constitution, Pursuant to 42 U.S.C. §§ 1983, 1985 and 1988**

85.    Plaintiff repeats, re-alleges, and incorporates by reference, the allegations contained in the preceding paragraphs 1 through 87 as if set forth fully herein.

86.    The Fourteenth Amendment to the United States Constitution proves that no state shall "deprive any person of life, liberty, or property, without due process of law."

87.    A person has a protected liberty interest in pursuing his education as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

88.    Plaintiffs constitutionally protected property interest in his degree, which he completed and earned, and relied upon, and continues to rely upon, for his employment and immigration status, are to be free from arbitrary dismissal arise from the policies, courses of conduct, practices and process set forth by Defendant.

89.    Plaintiffs constitutionally protected property interest in his degree, his employment, and his immigration status arise from the express and implied contractual relationship between Defendant and Plaintiff.

90.     It is well established that Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings such as the University of Illinois.

91.     Thus, a person who has been admitted to a public university, and has paid tuition to that university, has a protected property interest in the degree earned through coursework and the payment of tuition.  The State cannot deprive a person of this interest without due process.

92.     As a result, Plaintiff, who was subjected to disciplinary action that included the possibility of suspension or dismissal, if found responsible, is entitled to the due process protections of the Fourteenth Amendment to the United States Constitution.

93.     Defendant, as a public university, has an absolute duty to provide its students equal protection and due process of law by and through any and all policies and procedures set forth by the Defendant.

94.     Plaintiff continued his studies while at the University, abided by his financial obligations to the University and had obeyed the University's policies when he was dismissed from the University and would have continued but for the dismissal.

95.     Under both federal and state law Plaintiff had a constitutionally protected property interest in his degree and continued studies at the University.

96.     Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing.  The allegations in this matter, resulted in a sanction that will have lifelong ramifications for Plaintiff, including loss of his continued education at the University and employment, and are quasi-criminal in nature.

97.     Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct involving Jane Roe.

98.     In the course of its investigation and hearing process, Defendant knowingly, flagrantly, and maliciously violated Plaintiffs clearly established rights under

17

the Due Process Clause of the Fourteenth Amendment through the Defendant's repeated acts of deprivation of the minimal requirements of procedural fairness.

99.  Upon information and belief, Defendant was pressured by the Department of Education into complying with the Title IX investigative and adjudicatory process mandated by the 2011 Dear Colleague Letter.  Upon information and belief, the University did nothing to change its policies following the issuance of the 2017 Dear Colleague Letter, which called into question, including the lack of cross-examination, seen in the educational disciplinary process mandated by the 2011 version.

100.  Upon information and belief, Defendant was further pressured to make an example out of male students such as John Doe due to increased negative media attention on the "rape culture" at the University of Illinois.[2]  On October 30, 2017, a student newspaper published an op-ed titled *Like a Broken Record, UI Continues to Remind us it Cares about Sexual Assault*.[3]  Victim's rights advocacy groups were active on campus, protesting the "rape culture" with monikers like "we believe survivors.[4]"  The University was also actively involved in promoting April as Sexual Assault Awareness Month (SAMM).[5]

101.  Defendant deprived Plaintiff of his liberty and property interests without affording him basic due process, including but not limited to, his right to a fair adjudication, to a meaningful opportunity to be heard by those making the decision on credibility and ultimately responsibility, to question his accuser, to challenge the credibility of other adverse witnesses, and to present evidence and witnesses in support of his defense.  Part of this failure was the complete lack of testimony from Jane Doe. Rather than permit Plaintiff to present his defense to the Panel, Defendant conducted a

---

[2] https://will.illinois.edu/news/story/student-groups-address-rape-culture-on-u-of-i-campus
[3] https://dailyillini.com/opinions/2017/10/30/broken-record-illinois-continues-remind-us-cares-sexual-assault/
[4] https://www.facebook.com/SASAUIUC/
[5] https://oiir.illinois.edu/womens-center/wrc-events/sexual-assault-awareness-month

superficial and secretive hearing while having full control of what is presented to the Panel for adjudication of the charges.

102.    In attempting to demonstrate Defendant's compliance with the 2011 Dear Colleague Letter, and based on the gender bias expressed in its own training materials and implicit in its policies and procedures, the Defendant subjected Plaintiff to an insufficient process when they failed to provide Plaintiff with a fair and reasonable opportunity to defend himself and arrived at a predetermined, arbitrary and unwarranted decision.

103.    As a result, Defendant failed to provide Plaintiff with the basic due process protections that Defendant is required to provide students accused of sexual misconduct and faced with a possible sanction of dismissal.

104.    Defendant, as well as their agents, representatives, and employees of the University were acting under the color of law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

105.    Defendant, as well as their agents, representatives, and employees of the University agreed to, approved, and ratified this unconstitutional conduct.

106.    As a result of these due process violations, Plaintiff continued to suffer ongoing harm, including damages to his reputation, loss of his continued education, eventual loss of employment, and other non-economic and economic damages.

107.    As a direct and proximate cause of Defendant's conduct, Plaintiff sustained tremendous damages to his person and reputation, including without limitation, emotional distress, loss of continued education at the University, economic damages, and other direct and consequential damages.

108.    Plaintiff is entitled to injunctive relief as a result of the depravation of his due process and equal protection rights.  Preliminary injunctive should return the status quo before the controversy at issue.

19

109.    Further, injunctive relief to provide Plaintiff with a fair and equitable student disciplinary process conforming with his due process and equal protection rights is proper.  Plaintiff is entitled to have a hearing affording him his rights under the law.  In contrast, the University can have no legitimate interest in failing to provide a fair, equitable and impartial hearing, conforming to the law and the rights as are afforded to persons under the law.

110.    Money damages are inadequate in that money damages will not adequately and fully compensate Plaintiff for the loss of time spent at the University, further educational opportunities, and damage to his reputation and good name.

111.    Further the harm to Plaintiff is irreparable.  Without injunctive relief, for example the Plaintiff will have an educational record forever tarnished, requiring Plaintiff to explain his dismissal from the University.

## COUNT II

### Title IX

112.    Plaintiff repeats, re-alleges and incorporates by reference, the allegations contained in the preceding paragraphs 1 through 114 as if set forth fully herein.

113.    Title IX of the Educational Amendments of 1972 ("Title IX"), codified at 20 U.S.C. §1681, *et seq*., provides, in relevant part, "No person in the United States shall, on the basis of sex, be excluded from participation or activity receiving Federal financial assistance."

114.    Title IX applies to all public and private educational programs and institutions that receive any federal financial assistance.

115.    The University is a public educational institution that receives federal funding and/or assistance and is therefore subject to Title IX.

116. The University's imposition of discipline where gender is a motivating factor in the investigation and/or decision to discipline relating to allegations of sexual misconduct is enforceable through a private cause of action.

117. Defendant had an obligation under Title IX to ensure that adequate training is provided to investigate and determine what constitutes a violation and appropriate discipline was provided by Defendant.

118. The Defendant is required to provide basic due process rights to all parties involved in a sexual misconduct investigation and/or hearing.

119. Pursuant to Title IX, Plaintiff has a right to pursue his education free from discrimination by Defendant on the basis of sex.

120. In violation of Title IX, Plaintiff was wrongfully subjected to a University disciplinary process marred by procedural flaws and sexual bias against males.

121. Plaintiff was subjected to an erroneous outcome by Defendant with respect to the investigation and discipline issued against him in this matter, in violation of Title IX.

122. Upon information and belief, Defendant's training materials provided to investigators, the panel and the Senate Committee, instilled a bias against male students accused of violating its policies, as the training materials identifies males as the perpetrators in all but one of the "case studies" provided and in certain instances identifies gender violence victims as female.

123. The training materials, combined with the pressure to eradicate gender-based violence on campus create a bias against male students facing charges relating to sexual misconduct.

124. The denial of due process and gender bias that existed throughout the investigation and enforcement of the discipline against Plaintiff resulted in an erroneous outcome that was based on flawed facts, logic and credibility determinations by Defendant.

125.    Upon information and belief male students in sexual misconduct cases at the University are discriminated against on the basis of their sex. Male students are presumed guilty, forced to meet a burden of proof that is inconsistent with the University's polices, and credibility determinations are made against male students. In situations where both students have consumed alcohol, the male student is presumed to have engaged in sexual misconduct regardless of whether the female student has consented or initiated the sexual conduct.

126.    As a direct and proximate cause of Defendant's conduct, Plaintiff sustained tremendous damages to his person and reputation, including without limitation emotional distress, loss of continued education at the University, economic damages, and other direct and consequential damages.

## COUNT III

### Breach of Contract

127.    Plaintiff repeats, re-alleges and incorporates by reference, the allegations contained in the preceding paragraphs 1 through 129 as if set forth fully herein.

128.    Based on the foregoing, Defendant created express and implied contracts when Plaintiff accepted an offer of admission, paid the required tuition and fees and fully completed his coursework in a satisfactory manner. In exchange for Plaintiff's performance of his contractual obligation, Defendant agreed to provide enrollment at the University and confer a degree and to conduct itself in accordance with its written policies and procedures.

129.    Defendant breached its express and/or implied contract with Plaintiff by not conferring his degree and by failing to follow the University's written policies and procedures including but not limited to the following:

a.      Defendant's Code, Policy, Appendix D, and the Student Disciplinary Procedures provides that students will not be dismissed from the University without following its specified procedures;

b.      The Defendant's Policy further provided that students' Due Process Rights would not be denied or diminished;

c.      Defendant deprived Plaintiff of the opportunity to have any kind of meaningful hearing, despite the severity of the charges against him and the potentially devastating effects on his academic and professional career;

d.      Instead, Defendant selected two investigators to investigate the allegations and to collect evidence.  The investigators interviewed Plaintiff about the topic and permitted him to provide additional explanations, questions and evidence in writing.

e.      Defendant deprived Plaintiff of the procedural safeguards that have repeatedly been judicially required to be present in such a hearing, including the right to be heard, the right to present evidence and witnesses, confront one's accuser and challenge adverse witnesses through cross- examination, all before an impartial and objective factfinder.

130.    Defendant violated Plaintiff's fundamental right to liberty in his good name, reputation, and employment without a fair and just hearing process and in violation of his Due Process rights.

131.    Therefore, Defendant violated the contract with Plaintiff when it failed to afford him a proper hearing on the charges before him.

## COUNT IV

### Declaratory Judgment

132.    Plaintiff repeats, re-alleges and incorporates by reference, the allegations contained in the preceding paragraphs 1 through 134 as if set forth fully herein.

133.    Defendant has committed numerous violations of Plaintiff's rights as set forth herein.

134.    Plaintiff's future educational and career prospects have been severely damaged.  Without appropriate redress, the unfair outcome will continue to cause irreversible and irreparable damages to Plaintiff to his educational and employment prospects, in perpetuity.

135.    As a result of the foregoing, there exists a justiciable controversy between the Plaintiff and Defendant with respect to the outcome, permanency, and future handling of Plaintiffs formal student record at the University.

136.    Therefore, Plaintiff respectfully requests that this Honorable Court, pursuant to 28 U.S.C. §2201, declare that:  (i) the outcome and findings made by Defendant relating to the allegations set forth by Jane Roe be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged and sealed; (iv) any record of Plaintiff's dismissal from the University be removed from his educational file; (v) any record of Jane Roe's complaint against Plaintiff be permanently destroyed; (vi) Plaintiff be reinstated to the University; (vii) Defendant's rules, regulations and guidelines relating to the adjudication of allegations of sexual misconduct are unconstitutional as applied.

## COUNT V

### Declaratory Judgment

137.    Plaintiff repeats, re-alleges and incorporates by reference, the allegations contained in the preceding paragraphs 1 through 139 as if set forth fully herein.

138.    Based on the foregoing, Defendant created express and implied contracts when Plaintiff accepted an offer of admission, paid the required tuition and fees, and fully completed his coursework in a satisfactory manner.  In exchange for Plaintiff's performance of his contractual obligation, Defendant agreed to provide enrollment at the

University and confer a degree and to conduct itself in accordance with its written
policies and procedures.

139.    Defendant breached its express and/or implied contract with Plaintiff by
not conferring his degree and by failing to follow the University's written policies and
procedures, including but not limited to the following:

a.      Defendant's Code, Policy Appendix D, and the Student
Disciplinary Procedures provides that students will not be dismissed from the
University without following its specified procedures;

b.      The Defendant's Policy further provided that students' Due Process
Rights would not be denied or diminished;

c.      Defendant deprived Plaintiff of the opportunity to have any kind of
hearing, despite the severity of the charges against him and the potentially
devastating effects on his academic and professional career;

d.      Instead, Defendant selected two investigators to investigate the
allegations and to collect evidence.  The investigators interviewed Plaintiff about
the topic and permitted him to provide additional explanations, questions and
evidence in writing.

e.      Defendant deprived Plaintiff of the procedural safeguards that have
repeatedly been judicially required to be present in such a hearing, including the
right to be heard, the right to present evidence and witnesses, confront one's
accuser and challenge adverse witnesses through cross-examination all before an
impartial and objective factfinder.

140.    Defendant failed to take any testimony from Jane Roe relying instead on
summaries prepared by investigators.  Defendant violated Plaintiff's fundamental right to
liberty in his good name, reputation and employment without a fair and just hearing
process and in violation of his Due Process rights.

141.    Therefore, Defendant violated the contract with Plaintiff when it failed to afford him a proper hearing on the charges before him.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Honorable Court enter an order for judgment in favor of Plaintiff and against Defendants as follows:

(i)     A preliminary and subsequent permanent injunction fully reinstating Plaintiff to the University;

(ii)    Expunge and/or seal any reference to the Jane Roe complaint, the charges, the investigation and/or the adjudication of the charges from Plaintiff's disciplinary file;

(iii)   The record of Plaintiffs dismissal be removed from his educational file;

(iv)    Defendant's rules, regulations and guidelines relating to the adjudication of allegations of sexual misconduct are unconstitutional as applied;

(v)     An award of Plaintiff's attorney's fees and costs; and

(vi)    Awarding Plaintiff such other and further relief that this Court deems just, equitable and proper.

Respectfully submitted,

By: _____

Rochelle A. Funderburg
ARDC#:  6180510
Meyer Capel, A Professional Corporation
306 W. Church Street
P.O. Box 6750
Champaign, IL 61826-6750
Phone:  (217) 352-1800
rfunderburg@meyercapel.com

# ARTICLE 1—STUDENT RIGHTS AND RESPONSIBILITIES

## PART 1. STUDENT RIGHTS

### § 1-101  Preamble

(a)  A student at the University of Illinois at the Urbana-Champaign campus is a member of a University community of which all members have at least the rights and responsibilities common to all citizens, free from institutional censorship; affiliation with the University as a student does not diminish the rights or responsibilities held by a student or any other community member as a citizen of larger communities of the state, the nation, and the world.

(b)  Any rules or regulations considered necessary to govern the interaction of the members of the University community are intended to reflect values that community members must share in common if the purpose of the community to advance education and to enhance the educational development of students is to be fulfilled. These values include the freedom to learn, free and open expression within limits that do not interfere with the rights of others, free and disinterested inquiry, intellectual honesty, sustained and independent search for truth, the exercise of critical judgment, respect for the dignity of others, and personal and institutional openness to constructive change. The following enumeration of rights shall not be construed to deny or disparage other rights retained by these individuals in their capacity as members of the campus community or as citizens of the community at large.

### § 1-102  In the Classroom

The instructor, in the classroom and in conference, should encourage free discussion, inquiry, and expression. Student performance should not be evaluated on opinions or conduct in matters unrelated to academic standards.

(a)  Students should be free to take reasoned exception to the data or views offered in any course of study and to reserve judgment about matters of opinion, but they are responsible for learning the content of any course of study for which they are enrolled.

(b)  Students should have protection through orderly procedures against prejudiced or capricious academic evaluation. At the same time, they are responsible for maintaining standards of academic performance established for each course in which they are enrolled.

(c)  Information about student views, beliefs, and political associations that instructors acquire in the course of their work as instructors, advisers, and counselors should be considered confidential. Protection against improper disclosure is a serious professional obligation. Judgments of ability and character may be provided under appropriate circumstances, normally with the knowledge or consent of the student.

(d)  The instructor is in charge of the orderly conduct of the class and may exclude a student or an auditor who does not comply with a reasonable request in this regard. If the student is registered for the course and if the disruption is repeated or so egregious as to violate other conduct regulations, (usually § 1-302(f)), the instructor, after consultation with the department head or designee and the Executive Director of the Senate Committee on Student Discipline, may exclude the student from the class until such time as the disciplinary matter has been resolved. If the disciplinary matter is resolved in a manner that permits the student to return to class, the instructor, in consultation with the department head and the Executive Director of the Senate Committee on Student Discipline or designee, shall decide

1

EXHIBIT

A

whether and to what extent the student will be permitted to make up course work missed while excluded from class.

(e) Should a student feel that his or her rights as a student have been violated, the student may discuss the matter, to the extent possible, with his or her instructor in the relevant course. If a resolution cannot be reached, the student may contact the head of the department in which the course is being offered. If further assistance is needed, the student may contact the dean's office of the college offering the course. Assistance navigating the process is available through the Student Assistance Center in the Office of the Dean of Students at (217) 333-0050 or helpdean@illinois.edu Monday-Friday between the hours of 8:30 a.m. and 5:00 p.m.

### § 1-103 Campus Expression

(a) Discussion and expression of all views is permitted within the University subject only to requirements for the maintenance of order. Support of any cause by orderly means that are not in violation of law and that do not disrupt the operation of the University nor interfere with the rights of others is permitted.

(b) Members and organizations in the University community may invite and hear any persons of their own choosing, subject only to reasonable requirements on time, place, and manner for use of University facilities.

(c) The campus press and media are to be free of censorship. The editors and managers shall not be arbitrarily suspended because of student, faculty, administration, alumni, or community disapproval of editorial policy or content.

(d) The right of peaceful protest is recognized within the University community. The University retains the right to assure the safety of individuals, the protection of property, and the continuity of the educational process.

(e) Lawful picketing and other forms of peaceful protest are permitted on University premises except that lawful picketing is permitted only out-of-doors.

### § 1-104 Privacy

(a) Members of the University community have the same rights of privacy as other citizens and surrender none of those rights by becoming members of the academic community. These rights of privacy extend to residence hall living. Nothing in University regulations or contracts shall give University officials authority to consent to a search by police or other government officials of offices assigned or living quarters leased to individuals except in response to a properly executed search warrant or search incident to an arrest.

(b) When the University seeks access to an office assigned or living quarters leased to an individual to determine compliance with provisions of applicable multiple dwelling unit laws, ordinances, and regulations, or for improvement or repairs, the occupant shall be notified of such action not less than twenty-four hours in advance. There may be entry without notice in emergencies where imminent danger to life, safety, health, or property is reasonably feared and for custodial service.

(c) The University may not conduct or permit a search of an office assigned or living quarters leased to an individual except in response to a properly executed search warrant or search incident to an arrest.

(d) The University shall not regulate the social life of students or their organizations except as such regulations may apply to use of University premises, facilities, or premises approved for student residences. Additional regulations for living units may be made by a democratically constituted student government for the unit.

(e) The University shall not regulate the hours individuals may keep.

## § 1-105  Student Records

(a)  The University and its subdivisions should have a carefully considered policy as to the information which should be part of a student's permanent educational record and as to the conditions of its disclosure. To minimize the risk of improper disclosure, academic and disciplinary records are normally separate. (See, however, § 3-704(a).) Access to the student's own records and files is guaranteed to each individual and is subject only to reasonable regulation as to time, place, and supervision.

(b)  Transcripts of academic records should contain only information about academic status and conditions relating to the student's eligibility for continuing registration on this campus. Information from disciplinary or counseling files should not be available to unauthorized persons on campus, or to any person off campus without the express consent of the subject involved, except in cases where the student is not competent to grant such consent. In such cases, information will be made available only where the safety of persons or property is involved. No records should be kept which reflect the political activities or beliefs of students.

(c)  Provisions should also be made for periodic routine destruction of noncurrent disciplinary records. Administrative staff and faculty members should respect confidential information about students which they acquire in the course of their work.

(d)  The records and files of individuals no longer at the University shall continue to be subject to the provisions of this document.

## § 1-106  Student Affairs

In student affairs, certain standards must be maintained if the freedom of students is to be preserved.

(a)  Freedom of Association

Students bring to the campus a variety of interests previously acquired and develop many new interests as members of the academic community. They should be free to organize and join associations to promote their common interests.

(1)  The membership, policies, and actions of a Registered Organization and Registered Student Organization usually will be determined by the vote of only those persons who hold bona fide membership in the college or University community.

(2)  Affiliation with an extramural organization should not of itself disqualify a student organization from institutional recognition.

(3)  Registered Organizations and Registered Student Organizations are not required to have campus advisors. However, if they chose to have one, each organization should be free to choose its own adviser, and institutional recognition should not be withheld or withdrawn solely because of the inability of a student organization to secure an adviser. Campus advisers may advise organizations in the exercise of responsibility, but they should not have the authority to control the policy of such organizations.

(4)  The name(s) and address(es) of an agent or agents, and/or officers of a Registered Organization and Registered Student Organization, are required as a condition of registration.

(5)  Campus organizations, including those affiliated with an extramural organization, shall not discriminate against a member or prospective member on the basis of race, color, religion, sex, sexual orientation including gender identity, national origin, ancestry, age, marital status, disability, unfavorable discharge from the military, or status as a disabled veteran or veteran of the Vietnam era, except as specifically exempted by law.

(b) Freedom of Inquiry and Expression

(1)  Students, Registered Organizations and Registered Student Organizations should be free to examine and to discuss all questions of interest to them, and to express opinions publicly and privately. They should always be free to support causes by orderly means which do not disrupt the regular and essential operation of the institution. At the same time, it should be made clear to the academic and the larger community that in their public expressions or demonstrations, students or student organizations speak only for themselves.

(2)  Students should be allowed to invite and hear any person of their own choosing.

Those routine procedures required by an institution before a guest speaker is invited to appear on campus should be designed only to ensure that there is orderly scheduling of facilities, adequate financial underwriting for costs of services to be provided by the University, adequate preparation for the event, and that the occasion is conducted in a manner appropriate to an academic community. The University's control of campus facilities should not be used as a device of censorship. It should be made clear to the academic and larger community that sponsorship of guest speakers does not necessarily imply approval or endorsement of the views expressed either by the sponsoring group or the institution.

### § I-107 Religious Beliefs, Observances, and Practices

(a) Illinois law requires the University to reasonably accommodate its students' religious beliefs, observances, and practices in regard to admissions, class attendance, and the scheduling of examinations and work requirements. (See § 1-501, Article 3, Part 2.)

(b) Any student may appeal in writing an instructor's decision on a request based on religious beliefs, observances, and practices to the dean or director of the academic unit offering the course. Before taking action, the dean or director should request that the instructor explain his or her decision in writing.

### § I-108 Nondiscrimination Policy

(a) The commitment of the University to the most fundamental principles of academic freedom, equality of opportunity, and human dignity requires that decisions involving students and employees be based on individual merit and be free from invidious discrimination in all its forms.

(b) It is the policy of the University not to engage in discrimination or harassment against any person because of race, color, religion, sex, pregnancy, disability, national origin, citizenship status, ancestry, age, order of protection status, genetic information, marital status, sexual orientation including gender identity, arrest record status, unfavorable discharge from the military, or status as a protected veteran and to comply with all federal and state nondiscrimination, equal opportunity, and affirmative action laws, orders, and regulations. This nondiscrimination policy applies to admissions, employment, and access to and treatment in the University programs and activities. Complaints of invidious discrimination prohibited by University policy are to be resolved within existing University procedures.

(c) For additional information on the equal opportunity, affirmative action, and harassment policies of the University, please contact the Director of The Office for Access & Equity (OAE) at:

616 East Green Street, Suite 214
Champaign, IL 61820
(217) 333-0885
accessandequity@illinois.edu
**oae.illinois.edu**

(d) For additional information on Title IX, ADA, or 504, please contact the Title IX Coordinator at the Title IX and Disability Office at:

616 East Green Street, Suite 214
Champaign, IL 61820
(844) 616-7978
titleixcoordinator@illinois.edu
**wecare.illinois.edu/titleix**

### § I-109 Statement on Consenting Sexual Relationships

University guidelines on responsible professional conduct state that individuals assessing the work of others should base their assessments on appropriate professional criteria. Due to

4

the inherent conflicts of interest, no individual should initiate or participate in institutional or educational decisions involving a direct benefit or penalty to a person with whom that individual has or has had a sexual relationship. Where supervisory or student teacher relationships exist between husband and wife, or members of a couple, whether married or not, it is the responsibility of the teacher or supervisor to alert his/her supervisor so that appropriate arrangements can be made.

### § 1-110   Policy for the Provision of Reasonable Accommodations for Students with Disabilities

(a)   The University provides reasonable accommodations to students with disabilities admitted to study at the University in accordance with the following procedures. As the term is used herein, "reasonable accommodations" refer to those academic adjustments, services, and aids provided to otherwise qualified students with disabilities to facilitate equal access to University programs and activities. The Division of Disability Resources and Educational Services (DRES) coordinates the University's efforts to provide these reasonable accommodations. DRES will consult as necessary to facilitate the processing of requests for reasonable accommodations.

(b)   In general, students are responsible for informing the University of their status as a person with a disability and their need for reasonable accommodations. Students with disabilities should direct their requests for reasonable accommodations to the DRES Student Services Office by phone at (217) 333-4603, or disability@illinois.edu. The determination of reasonable accommodations will be based upon an individual student's needs. For academic accommodations, DRES will consult with the faculty member for whose course the accommodations are sought. The University may decline requests for accommodations that impose an undue hardship on the campus or that require the fundamental alteration of academic standards, programs, or coursework.

(c)   In order to be considered for reasonable accommodations, the student must meet the following requirements:
  (1)   The student must submit a completed Application for Services to DRES. Students may obtain applications from:
      DRES: in person at the Rehabilitation-Education Center at 1207 South Oak Street, Champaign IL, or online at disability.illinois.edu.
  (2)   The student must have a disability and provide documentation of a disability in accordance with the applicable documentation criteria.

(d)   To facilitate timely review of a student's request for reasonable accommodation, the student or prospective student who is requesting accommodations to access University programs and activities must submit a completed Application for Services to DRES, as soon as possible. Some accommodations, such as interpreter, real-time captioning services, or the conversion of print-based educational materials to alternative accessible formats can require substantial lead time to schedule or prepare. Therefore, it is recommended that the student return the Application for Services and discuss accommodation needs with DRES personnel at least six weeks before the date on which the student may first require the accommodations.

(e)   A student may appeal to the Director of DRES:
  (1)   an accommodation recommendation by DRES if the student deems such recommendation to be unsatisfactory;
  (2)   implementation of a DRES accommodation recommendation if the student deems such implementation ineffective. A student may appeal a determination of the DRES Director to the Dean of the College of Applied Health Sciences.

(f)   A student may also direct questions or concerns regarding accommodation decisions by DRES or other campus units to the Office for Access & Equity (OAE), which is located at 616 E. Green St., Suite 214, Champaign, IL or by phone at (217) 333-0885.

### § 1-111 Sexual Misconduct Policy

(a)   The University of Illinois at Urbana-Champaign ("University") is committed to providing a safe and welcoming campus environment free from discrimination based on sex, which

includes sexual assault, sexual exploitation, stalking, sexual harassment, dating violence, and domestic violence (collectively referred to as sexual misconduct). The University prohibits and will not tolerate sexual misconduct because such behavior violates the University's institutional values, adversely impacts the University's community interest, and interferes with the University's mission. The University also prohibits retaliation against any person who, in good faith, reports or discloses a violation of this policy, files a complaint, and/or otherwise participates in an investigation, proceeding, complaint, or hearing under this policy. Once the University becomes aware of an incident of sexual misconduct, the University will promptly and effectively respond in a manner designed to eliminate the misconduct, prevent its recurrence, and address its effects.

(b)  This policy applies to (1) all students, Registered Organizations, Registered Student Organizations, and others subject to student discipline pursuant to § 1-301 of the Student Code; (2) all University employees; (3) other affiliated individuals, including but not limited to, for purposes of this policy, visiting faculty, visiting scholars, and post-doctoral fellows; and (4) third parties, including but not limited to contractors, subcontractors, volunteers, and visitors. Any person asserting a violation may invoke this policy. This policy applies regardless of actual or perceived sexual orientation or gender identity. This policy covers conduct that occurs on University premises or property, as well as conduct that does not occur on University premises or property that substantially affects the University community's interest.

(c)  Definitions:
   (1)  Sexual misconduct includes sexual harassment, sexual assault, sexual exploitation, stalking, dating violence and domestic violence.
   (2)  Sexual assault is any sexual contact that does not involve the knowing consent of each person, including (A) any form of sexual penetration without consent; and (B) any intentional or knowing touching or fondling by either person, directly or through clothing, of the sex organs, buttocks, or breasts of the other person for the purpose of sexual gratification or arousal of either person without consent.
   (3)  Consent is informed, freely and actively given, mutually understandable words or actions that indicate a willingness to participate in mutually agreed upon sexual activity. A person can withdraw consent at any time. There is no consent when there is force, threats, intimidation, or duress. A person's lack of verbal or physical resistance or manner of dress does not constitute consent. Consent to past sexual activity with another person does not constitute consent to future sexual activity with that person. Consent to engage in sexual activity with one person does not constitute consent to engage in sexual activity with another person. A person cannot consent to sexual activity if such person is unable to understand the nature, fact, or extent of the activity or give knowing consent due to circumstances including without limitation the following: (A) the person is incapacitated due to the use or influence of alcohol or drugs; (B) the person is asleep or unconscious; (C) the person is under the legal age to provide consent; or (D) the person has a disability that prevents such person from having the ability or capacity to give consent.
   (4)  Sexual exploitation is the use of another person's nudity or sexual activity without consent for the purpose of sexual gratification, financial gain, personal benefit, personal advantage, or any other non-legitimate purpose. Sexual exploitation includes, but is not limited to: (A) without the knowledge and consent of all participants, observing, recording, or photographing nudity or sexual activity of one or more persons in a location where there is a reasonable expectation of privacy, allowing another to observe, record, or photograph nudity or sexual activity of one or more persons, or otherwise distributing recordings, photographs, or other images of the nudity or sexual activity of one or more persons; and (B) sending sexually explicit materials of another person without consent of the recipient.
   (5)  Sexual harassment is unwelcome sexual, sex-based, or gender-based conduct, whether verbal, written, electronic and/or physical in nature:
      (A)  that is (1) sufficiently severe or pervasive; and (2) objectively offensive; and (3) unreasonably interferes with, denies, or limits a person's ability to participate or benefit from educational and/or employment opportunities, assessments, or status at the University; or
      (B)  by a person having power or authority over another in which submission to

such conduct is made explicitly or implicitly a term or condition of educational and/or employment opportunities, participation, assessments, or status at the University.

(6)  Stalking is two or more acts directed at a specific person that would cause a reasonable person to fear for her, his, or others' safety, or to suffer substantial emotional distress, and includes, but is not limited to, following, monitoring, surveilling, or threatening a person; initiating or continuing contact with a person without consent; or interfering with or damaging a person's property.

(7)  Dating violence is violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim, and the existence of such a relationship shall be determined based on the reporting party's statement and with consideration of the length of relationship, the type of the relationship, and the frequency of the interaction between the persons involved in the relationship.

(8)  Domestic violence is felony or misdemeanor crimes of violence committed by: (A) a current or former spouse or intimate partner of the alleged victim; (B) a person with whom the alleged victim shares a child in common; (C) a person who is cohabitating with, or has cohabitated with, the alleged victim as a spouse or intimate partner; (D) a person similarly situated to a spouse of the alleged victim under the domestic or family violence laws of the State of Illinois; or (E) any other person against an adult or youth alleged victim who is protected from that person's acts under the domestic or family violence laws of the State of Illinois.

(d)  Retaliation is any action, or attempted action, directly or indirectly, against any person(s), who, in good faith, reports or discloses a violation of this policy, files a complaint, and/or otherwise participates in an investigation, proceeding, complaint, or hearing under this policy.  Retaliation includes, but is not limited to harassment, discrimination, threats, job termination, adjustment in pay or responsibilities, or negative impact on academic progress. Actions are considered retaliatory if they have a materially adverse effect on the working, academic, or living environment of a person; or if they hinder or prevent the person from effectively carrying out their University responsibilities. Any person or group within the scope of this policy who engages in retaliation is subject to a separate complaint of retaliation under this policy.

(e)  The Lead Title IX Coordinator is responsible for coordinating the University's efforts to comply with and carry out its responsibilities under Title IX of the Education Amendments of 1972 ("Title IX"), which prohibits sex discrimination, including sexual misconduct, in education programs and activities for institutions that receive federal financial assistance, as well as retaliation for the purpose of interfering with any right or privilege protected by Title IX. The Lead Title IX Coordinator oversees the University's response to all reports and complaints of sexual misconduct to monitor outcomes, identify and address any patterns or systemic problems, and to assess their effects on the campus climate. The Lead Title IX Coordinator also evaluates requests for confidentiality by those who report or complain about sexual misconduct in the context of the University's responsibility to provide safe and welcoming campus environment for all students free from discrimination based on sex. Following a report or complaint of sexual misconduct, the University is required to conduct an adequate, reliable, impartial, equitable, and prompt investigation, including: (1) determining whether the report or complaint alleges conduct that may, upon further investigation, constitute prohibited sexual misconduct; (2) appointing an investigative team to conduct that investigation; (3) determining whether reports and complaints are handled properly in a prompt and timely manner; (4) informing all parties regarding the disciplinary process; (5) confirming that all parties have been notified of a decision and the right to, and procedures for, an appeal, if applicable; (6) maintaining information and documentation related to the investigation in a secure manner, consistent with the University's obligations to disclose information as required by law; and (7) monitoring compliance with timeframes set forth in the applicable procedures.

(f)  Danielle Morrison serves as the University's Title IX and Disability Coordinator and can be contacted at the Title IX and Disability Office, 616 East Green Street, Suite 214, Champaign, IL 61820; by phone at (844) 616-7978; or by email at **titleixcoordinator@illinois.edu.**

(g)  A person should contact the Lead Title IX Coordinator or a Deputy Title IX Coordinator

to: (1) seek information or training about rights and available actions to resolve reports or complaints involving potential sex discrimination, including sexual misconduct; (2) file a complaint or make a report of sex discrimination, including sexual misconduct; (3) notify the University of an incident, policy or procedure that may raise potential Title IX concerns; (4) get information about available resources (including confidential resources) and support services relating to sex discrimination, including sexual misconduct; and (5) ask questions about the University's policies and procedures related to sex discrimination, including sexual misconduct.

## PART 2. GENERAL RESPONSIBILITIES OF STUDENTS

### § I-201   Responsibilities of Students

(a)  Students are responsible for knowing and complying with the regulations of the University, their college, and the departments from which they take courses, and for fulfilling the requirements for a particular degree. Regulations applicable to given colleges may be obtained from the respective deans.

(b)  It is expected that students enrolled in the University will conduct themselves at all times in accordance with accepted principles of responsible citizenship and with due regard for the rights of others.

## PART 3. STUDENT DISCIPLINE

### § I-301   Basis for Discipline—Source and Jurisdiction

(a)  By authority of the Board of Trustees, the Urbana-Champaign Senate Committee on Student Discipline is responsible for the administration of student discipline for acts involving the violation of campus or University regulations. These regulations are formulated by a variety of sources, including, but not limited to, the Conference on Conduct Governance, the Senate, the Chancellor, the President, and the Board of Trustees.

(b)  It is in the best interest of the University and all those who are students or who may desire to become students at the Urbana-Champaign campus that the basis for discipline at this campus be clearly defined. The University discipline system recognizes that not all violations of law affect the interests of the University community, and the discipline system accepts jurisdiction only in those instances in which the University community's interest is substantially affected. On the other hand, the University may take disciplinary action for incidents that violate the University's rules of conduct even though such conduct is not prosecuted in the courts. All members of the University community are expected to observe high standards of integrity and ethical behavior. The University discipline system may take action only upon the following basis:
   (1)  all actions that are violations of law or Board of Trustees' action or any University rule of conduct and that occur on University premises or property
   (2)  all actions that violate any of the laws or regulations cited in section (a) above and that substantially affect the University community's interest, even though such actions do not occur on University premises or property (for further information about the criteria used by the Senate Committee on Student Discipline in determining the kinds of conduct covered by this jurisdiction, see www.conflictresolution.illinois.edu or contact the Office for Student Conflict Resolution)
   (3)  all cases referred to the discipline system following interim suspension by the Chancellor
   (4)  academic violations
   (5)  appeals and referrals from student judiciaries arising from violations of regulations
   (6)  violations of University vehicle or bicycle regulations

(c)  Individuals subject to student discipline include but is not limited to all persons:
   (1)  taking courses at the University;
   (2)  who cancel, withdraw, or graduate after committing behavior which may violate the code;
   (3)  who are not officially enrolled for a particular term but have a continuing relationship

with the University; and

(4)    who have been notified of and accepted their admission.

This definition includes but is not limited to individuals between academic terms and persons who consent to participating in the student discipline process.

(d)    The actions of a Registered Organization and Registered Student Organization in University-approved activities or University-sponsored activities that are in violation of University regulations for organizations may result in disciplinary action against that organization.  In addition, individuals involved may also receive disciplinary action as well.

(e)    The University reserves the right to deny admission to any person because of previous misconduct that may substantially affect the interest of the University, or to admit such a person on an appropriate disciplinary status. The admission of such a person will not be approved or denied until the case has been heard by the appropriate disciplinary committee. (This applies to a person not now enrolled in the University who might apply for admission, or to a person who has pre-enrolled whether or not the applicant has paid a deposit.) A favorable action of the appropriate disciplinary committee does not abrogate the right of any dean or director to deny admission on the basis of scholarship. (See § 1-303.)

(f)    The University reserves the right to withhold authority to register to any student or former student because of previous misconduct that may substantially affect the interests of the University or to assign appropriate disciplinary status to the student or former student. Permission to register will not be approved or denied until the case has been heard by the appropriate disciplinary committee. A favorable action by the appropriate disciplinary committee does not abrogate the right of any dean or director to deny the authority to register on the basis of scholarship. (See § 1-303.)

(g)    Students admitted to or enrolled in the Graduate College or any of the professional schools or colleges are subject to any additional conduct regulations of those units. Regulations will be available in printed form to those students.

(h)    The University will take disciplinary action for conduct violating §§ 1-302 to 1-311 below. Disciplinary action also may be taken for violations of other sections. Examples include but are not limited to: (1) § 1-102(d) (Orderly Conduct of Classes); (2) § 2-402 (Library Regulations); (3) § 2-404 (Picketing); (4) § 2-405 (Solicitation and Commercial Activity in University Residence Halls); (5) § 2-406 (Posting and Distribution of Handout Materials); and (6) § 2-606 (Use of In-line Skates, Roller Skates, and Skateboards).

(i)    Alleged violations of the *Student Code* noted in (h) above are resolved through procedures developed and approved by the Senate Committee on Student Discipline, its Subcommittees on Student Conduct, and Disciplinary Officers approved by the Senate Committee on Student Discipline. These procedures include: Disciplinary Officer Procedures (informal resolution); Procedures for Appeal from the Action of Disciplinary Officers; Procedures for the Subcommittee on Undergraduate Student Conduct; and Procedures for Appeal to the Senate Committee on Student Discipline. These procedures may be found at www.conflictresolution.illinois.edu or by contacting the Office for Student Conflict Resolution. Other procedures available at the Office for Student Conflict Resolution include procedures for the subcommittees for graduate students, law students, medical students, and veterinary medicine students. Among other rights delineated in these procedures, the right to written notice of charges and an opportunity to respond to those charges are guaranteed.

### § 1-302   Rules of Conduct

Students enrolling in the University assume an obligation to conduct themselves in a manner compatible with the University's function as an educational institution and suitable to members of the academic community. Conduct for which students are subject to discipline includes, but is not limited to, the following:

(a)    Conduct that threatens the health or safety of any person, including but not limited to:

**APPENDIX D**

**Student Conduct Protocol for Allegations of Sexual Misconduct, Including Sexual Harassment, Sexual Assault, Sexual Exploitation, Stalking, Dating Violence, and Domestic Violence**

In cases that include an accusation of sexual misconduct, including sexual harassment, sexual assault, sexual exploitation, stalking, dating violence, and domestic violence, against any student (including any student enrolled in the Carle Illinois College of Medicine, the College of Law, or the College of Veterinary Medicine), the following provisions shall also apply. In the event of a conflict between this Appendix and Article II, this Appendix shall prevail.

**Section 1: Definitions**

(a) Advisor. A person who provides a respondent or a complainant support, guidance, or advice. Respondents and complainants may be accompanied by an advisor of their choosing to any meeting with an investigator or to any proceeding to which the advisee is invited, provided that this advisor is not also a witness in the investigation.

(b) Complainant. A person who claims to have been or is reported to have been a victim of sexual misconduct, including sexual harassment, sexual assault, sexual exploitation, stalking, dating violence, and domestic violence.

(c) Counterclaim. A report, made by a respondent at any time after they have been notified by OSCR staff of the allegations against them, that the complainant has also engaged in sexual misconduct.

(d) Business Day. Any weekday when university offices are open for official business.

(e) Evidence. Any information, including testimony, collected during an investigation that is relevant to the determination of whether the respondent has violated the Student Code. Neither information that solely addresses the character of any person nor information about any complainant's prior sexual conduct with anyone other than the respondent is evidence.

(f) Evidence Packet. A compilation of the evidence in a case created at the conclusion of the investigation.

(g) Executive Director (or Director). The Director of the Office for Student Conflict Resolution or their designee.

(h) Investigative Report. A document created by the investigator that fairly summarizes the investigation and the evidence.

(i) Investigator. A person responsible for investigating allegations of sexual misconduct on behalf of the university. All investigators are trained on issues related to sexual misconduct and on conducting a trauma-informed investigation, and they receive annual training on such topics.

(j) OSCR. The Office for Student Conflict Resolution.

(k) Panel. A group of three members of the Subcommittee on Sexual Misconduct appointed by the Executive Director to adjudicate a case involving sexual misconduct. A Panel includes at least one student member.

(l) Panel Chair. The faculty or staff member designated by the Panel members to run the hearing.

(m) Respondent. A student who is alleged to have violated the Student Code by engaging in sexual misconduct.

(n) Sanction, Educational. An assignment, requirement, or task educationally related to a policy violation.

**EXHIBIT**

(o) Sanction, Formal. A disciplinary status imposed by the university in response to a policy violation.

(p) SCSD. The Senate Committee on Student Discipline.

(q) Sexual Misconduct. Sexual harassment, sexual assault, sexual exploitation, stalking, dating violence, and/or domestic violence.

(r) Subcommittee on Sexual Misconduct. The group of faculty, staff, and students trained to adjudicate cases that include allegations of sexual misconduct. This group is selected through an application process overseen by OSCR and approved by the SCSD.

(s) Witness. A person who may have relevant information regarding the facts of the case.

## Section 2: Complainant Rights

(a) Advisor. Any participating complainant is allowed to bring an advisor with them to any meeting with the investigator or any disciplinary proceeding to which they are invited, provided that this advisor is not also a witness in the investigation. This individual may communicate quietly with the complainant during such proceedings but may not speak for the complainant or otherwise directly participate. An advisor who fails to follow these instructions or behaves disruptively will be asked to leave. Upon request, OSCR staff will connect a complainant to a trained confidential advisor.

(b) Disability Accommodations. A qualifying complainant has the right to reasonable accommodations during any disciplinary process or proceeding in accordance with §1-110 of the Student Code.

(c) Evidence Review. The complainant will have the opportunity to review all evidence that will be used in reaching a final determination regarding responsibility.

(d) Interpreter. Any participating complainant may also bring an interpreter with them to any meeting with the investigator or any disciplinary proceeding to which they are invited, provided that this individual is not also a witness in the investigation. An interpreter who behaves disruptively will be asked to leave.

(e) Notice. Any participating complainant will receive written notification of any meetings or proceedings they are expected to attend. Notice is deemed given immediately when hand delivered or sent to the recipient's email address, or on the following business day when mailed.

(f) Objectivity. All disciplinary decisions will be based on an objective evaluation of evidence. No disciplinary decisions, including credibility determinations, will be based on a person's status as a complainant, respondent, or witness or on a person's membership in a protected class as listed in the university's Nondiscrimination Policy.

(g) Participation. Any participating complainant will have an opportunity to identify and present witnesses, to provide relevant information regarding the allegations, and to participate in an administrative hearing (if applicable). In addition, any participating complainant may refuse to provide a requested statement or to answer a question posed to them

(h) Timely Decision. Any complainant will receive a timely written decision following any administrative hearing or appellate review.

## Section 3: Respondent Rights

(a) Advisor. The respondent is allowed to bring an advisor with them to any meeting with the investigator or any disciplinary proceeding to which they are invited, provided that this advisor is not also a witness in the investigation. This individual may communicate quietly with the respondent during such proceedings but may not speak for the respondent or otherwise directly participate. An advisor who fails to follow these instructions or behaves disruptively will be asked to leave. Upon request and subject to availability, OSCR staff will identify a trained volunteer advisor for the respondent.

(b) Disability Accommodations. A qualifying respondent has the right to reasonable accommodations during any disciplinary process or proceeding in accordance with §1-110 of the Student Code.

(c) Evidence Review. The respondent will have the opportunity to review all evidence that will be used in reaching a final determination regarding responsibility.

(d) Interpreter. The respondent may also bring an interpreter with them to any meeting with the investigator or any disciplinary proceeding to which they are invited, provided that this individual is not also a witness in the investigation. An interpreter who behaves disruptively will be asked to leave.

(e) Notice. The respondent will receive written notification of the allegations against them and of any meetings or proceedings they are expected to attend. Notice is deemed given immediately when hand delivered or sent to the recipient's email address, or on the following business day when mailed.

(f) Objectivity. All disciplinary decisions will be based on an objective evaluation of evidence. No disciplinary decisions, including credibility determinations, will be based on a person's status as a complainant, respondent, or witness or on a person's membership in a protected class as listed in the university's Nondiscrimination Policy.

(g) Participation. The respondent will have an opportunity to identify and present witnesses, to provide relevant information regarding the allegations, and to participate in an administrative hearing (if applicable). In addition, the respondent may refuse to provide a requested statement or to answer a question posed to them.

(h) Timely Decision. The respondent will receive a timely written decision following any administrative hearing or appellate review.

**Section 4: Investigation**

(a) Intake and Review.

    (1) OSCR will oversee investigations of allegations against students. Once notified of allegations covered by this appendix, the Executive Director will assign an investigator to conduct the investigation.

    (2) The assigned investigator will first interview any participating complainants to determine the precise nature of the allegations. All participating complainants have the opportunity to request that the investigation begin promptly and proceed in a timely manner.

    (3) The investigator will then determine whether the allegations, if substantiated, would violate the Student Code. If not, the investigator will notify the complainant of their conclusion in a timely manner and conclude the investigation. If so, the investigation will continue.

(b) Allegation Notice. The investigator will issue a written allegation notice (to their university email address, if applicable) that informs the respondent and any participating complainants of the following:

(1) A detailed description, including the date (if known) and location (if known), of the alleged incident(s);

(2) The identity (if known) of any complainants involved in the incident(s);

(3) The section(s) of the Student Code that the respondent has been accused of violating;

(4) A link to these procedures or an attached copy of these procedures;

(5) An instruction for the respondent to call within five business days to schedule a meeting with the investigator. This meeting should occur within ten business days of the allegation notice, unless a conflict between the investigator's availability and the respondent's academic schedule require the meeting to be delayed further.

(6) A statement that the university prohibits retaliation, knowingly making false statements to university officials, and knowingly submitting false information to university officials.

(c) Respondent Interview. The investigator will attempt to interview the respondent in a timely manner (as described above). If the respondent fails to respond to the allegation notice or refuses to meet with the investigator, the investigation will continue, and OSCR may apply a registration hold.

(d) Evidence Collection and Witness Interviews. The respondent and the complainant will be given the opportunity to provide supporting information and documentation and to identify witnesses. The investigator will review all submitted materials and will attempt to interview all witnesses. The investigator may also seek additional information, documentation, and witnesses from other sources.

(e) Follow-up Interviews. The investigator may request additional meetings with the respondent and the complainant to discuss any information gathered during the investigation.

(f) Updates. As deemed appropriate by the Executive Director or their designee, OSCR will provide both the respondent and the complainant with periodic status updates during the investigation, the review process, and the appeal process.

(g) Ongoing Notice. If, in the course of an investigation, the investigator decides to investigate allegations not included in the original allegation notice, they will issue a new allegation notice in accordance with §4(b) above.

(h) Investigation Timeline. The anticipated duration of an investigation is approximately 40 business days following the allegation notice, but the actual duration of each investigation may vary depending on the complexity of the investigation, the severity and extent of the allegations, the number of witnesses, the need for language assistance or accommodation of disabilities, and the possibility of interruption by break periods. If the duration of an investigation will substantially exceed this estimate, the investigator will notify both the respondent and the complainant of the delay and the reason for the delay.

(i) Cooperation with Law Enforcement. If the incident under investigation has also been reported to the police, the investigator will contact the police for any information they are willing to share and may interview officers, detectives, etc. as part of the OSCR investigation. At the request of law enforcement and so as not to interfere with active police investigations, the investigator may delay interviewing specific individuals for short periods of time at the discretion of the Executive Director. However, the OSCR and police investigations are separate processes. As such, they follow different procedures, rules, and regulations, and the outcome of one does not determine the outcome in the other.

(j) Counterclaims. The university permits the respondent to make a formal counterclaim against a complainant. Counterclaims by the respondent may be made in good faith, but are, on occasion,

also made for purposes of retaliation, and the university is committed to preventing the process described in this appendix from being abused for retaliatory purposes. After receipt of a counterclaim, the investigator will consult with the Title IX Coordinator to assess whether the allegations have been made in good faith. If the investigator and the Title IX Coordinator are unable to reach a determination based on the available information, the investigator may gather additional evidence and consult again with the Title IX Coordinator on this question. If the investigator and the Title IX Coordinator determine that the counterclaim was not made in good faith, then any investigation into the counterclaim will cease and the counterclaim itself will be evaluated as a possible violation of the university's retaliation policy. If the investigator and the Title IX Coordinator determine that the counterclaim was made in good faith, the allegations will be resolved in accordance with the procedures described in this appendix. In some cases, the investigator may investigate the counterclaim and the original complaint together; in other cases, the investigation of the counterclaim may be delayed until after the resolution of the original complaint. How and when the counterclaim is investigated is at the sole discretion of the Executive Director.

**Section 5: Review of Evidence**

(a) Review of Evidence by the Complainant and Respondent. At the conclusion of the investigation, the investigator will compile all evidence into a packet and notify both the respondent and the complainant that they will have ten business days in which to review the evidence packet in the Office for Student Conflict Resolution during normal business hours and to submit a written response.

(b) Evaluation of Evidence by OSCR. The investigator will thoroughly evaluate the evidence collected, including any written responses submitted by the parties. If, in their opinion and the opinion of the Executive Director, no reasonable panel of decision-makers could, on the basis of this evidence, find the respondent in violation of any of the Student Code section(s) identified in the allegation notice, OSCR will notify both the respondent and the complainant that the process has concluded, that no disciplinary action will be taken against the respondent at that time, and that the matter may be reopened if new substantial evidence is brought to the attention of OSCR from any source. In such a situation, the complainant may request that the Title IX Coordinator (titleixcoordinator@illinois.edu) review OSCR's decision to conclude the investigation. If the Title IX Coordinator disagrees with OSCR's evaluation of the evidence, they may instruct OSCR staff to reopen the investigation. This decision lies in the sole discretion of the Title IX Coordinator, and the request is usually only granted in extraordinary circumstances. Other appeal options do not apply.

**Section 6: Investigative Report**

(a) Investigative Report. Assuming the evaluation described in §5(b) does not result in the closure of this case, the investigator will create an investigative report that fairly summarizes the investigation and the evidence.

(b) Investigative Report Review. The investigator will provide an electronic copy of the investigative report to both the respondent and the complainant and notify them that they may submit a written response to the report no later than five business days after the report has been sent.

**Section 7: Formal Hearing**

(a) Appointment of Panel. The Executive Director or their designee will appoint a Panel composed of three members of the Subcommittee on Sexual Misconduct, a pool of trained university faculty, students, and staff. Before the membership of this Panel is finalized, OSCR will provide both the respondent and the complainant with a list of all members of the Subcommittee on Sexual Misconduct. At this point, the respondent and complainant may challenge the objectivity of any person on this list. Such a challenge must be based on a conflict of interest (e.g., a prior relationship that may result in bias). The Executive Director or their designee will consider these challenges when making a final decision regarding Panel membership. At least one student must be appointed to the Panel, and the Executive Director will make every effort to appoint at least one faculty member to the Panel provided that doing so will not substantially delay the adjudication process. If the respondent is a graduate student, the Panel will include a representative of the Graduate College as a non-voting member. Once appointed, voting Panel members will select a faculty or staff member to serve as Panel Chair. Prior to serving on a Panel, all Panel members will have received appropriate annual training, developed in consultation with the university's Title IX Coordinator, on sexual harassment, sexual assault, sexual exploitation, stalking, dating violence, domestic violence, and the physiological and psychological effects of trauma.

(b) Panel Review of Materials. OSCR staff will provide the members of the panel with electronic access to the Investigative Report, Evidence Packet, and any written responses from the parties and give them sufficient time to review them thoroughly.

(c) Scheduling of the Hearing. OSCR staff will schedule an administrative hearing before the Panel to take place at least eight business days after the Investigative Report was sent to the parties.

(d) Notice of the Hearing. OSCR staff will notify both the respondent and the complainant by email of the date, time, and location of the hearing at least seven business days in advance.

(e) Hearing Rules

(1) The hearing will be closed to the public.

(2) The Panel Chair may exclude from the hearing any person who disrupts the orderly process of the hearing. This will not be considered cause to reschedule the hearing or continue the hearing on a later date.

(3) The hearing will proceed even if the respondent, the complainant, any advisor, or any witness fails to appear, provided the parties have been notified in accordance with §7(d).

(4) Evidence that was not provided to the investigator prior to the completion of the Investigative Report will not be considered unless it was not available to the party offering the evidence prior to the completion of the Investigative Report or the evidence could substantially change the outcome of the finding. The Panel Chair will determine whether such evidence meets one or both criteria.

(5) Persons who have no relevant information regarding the facts of the case may not participate as witnesses. This includes character references or witnesses to irrelevant incidents.

(6) Witnesses may only be present in the hearing while providing evidence.

(7) The hearing will be electronically recorded (audio only) by OSCR staff. In order to protect the confidentiality of the process and the privacy of individuals involved, no other participants are permitted to record the hearing. The Panel's deliberation is not electronically recorded.

(8) The Executive Director or their designee will advise the Panel and may participate in questioning and deliberation, but they may not vote. The investigator may not serve in this role.

(9) The investigator will be present during the hearing but will leave the hearing room during deliberation.

(10) Neither the complainant nor the respondent will be allowed to question, or otherwise address, each other or any witness directly. Instead, when provided for by the hearing procedures, they may suggest questions to be posed by the Panel Chair. The Panel Chair may choose not to ask a question if it has already been answered, is irrelevant, or is inappropriate (e.g., a question regarding the complainant's prior sexual conduct with anyone other than the respondent). The Panel Chair may also reword a relevant question that is asked in an inappropriate manner.

(11) At the request of either the complainant or the respondent, OSCR staff will make arrangements for one party to participate in the hearing from another room equipped with technology enabling the Panel members, the complainant, and the respondent to see and hear any person who is answering questions.

(12) The Panel Chair may set additional rules for the hearing as needed, provided that none conflict with any provision of this appendix.

(f) Hearing Procedures: Phase One

(1) Under the direction of the Panel Chair, all Panel members and participants will introduce themselves by name and role.

(2) The Panel Chair will briefly describe the order of the hearing.

(3) The Panel Chair will invite the investigator to make a statement (if they choose) regarding the investigation, and Panel members may question the investigator. The respondent and the complainant will then have an opportunity to suggest questions for the investigator.

(4) The Panel Chair will invite the complainant to make an opening statement regarding the allegations. This statement should last no longer than ten minutes unless the Panel Chair approves a greater duration. The Panel members will then question the complainant, after which the respondent will have an opportunity to suggest questions to be posed to the complainant.

(5) The Panel Chair will invite the respondent to make an opening statement regarding the allegations. This statement should last no longer than ten minutes unless the Panel Chair approves a greater duration. The Panel members will then question the respondent, after which the complainant will have an opportunity to suggest questions to be posed to the respondent.

(6) The Panel Chair will invite each participating witness into the room, one at a time, to answer questions from Panel members. For each witness, both the respondent and the complainant will have an opportunity to suggest questions to be posed by the Panel Chair.

(7) Panel members will have a final opportunity to question the complainant, the respondent, and the investigator regarding the allegations.

(8) The Panel Chair will invite the complainant to make a closing statement regarding the allegations. This statement should last no longer than five minutes.

(9) The Panel Chair will invite the respondent to make a closing statement regarding the allegations. This statement should last no longer than five minutes.

(10) The Panel Chair will excuse the complainant, the respondent, and the investigator from the room, and the Panel will enter into closed deliberation to find facts and determine responsibility. The Panel will make its decisions by simple majority vote and will apply the preponderance standard.

(11) When the Panel has finished deliberating, staff will escort the respondent and the complainant back into the room, and the Panel Chair will read the Panel's decision. If the Panel has not found the respondent in violation of any sections of the Student Code, the Panel Chair will adjourn the hearing. If the Panel has found the respondent in violation of at least one section of the Student Code, the hearing will proceed into Phase Two.

(g) Hearing Procedures: Phase Two

(1) The Panel Chair will invite the complainant to make a statement to the committee regarding the impact of the respondent's behavior relating to the violation(s) of the Student Code for which the respondent was found responsible and to submit any supporting documentation, and the Panel may question the complainant. Once Panel members have no further questions for the complainant, the Panel Chair will excuse the complainant from the room.

(2) The Executive Director or designee will then share with the Panel information regarding the respondent's disciplinary history that was not deemed relevant to allegations.

(3) The Panel Chair will invite the respondent to share any documentation that they would like the Panel to consider when determining sanctions, and the Panel may question the respondent.

(4) The Panel Chair will excuse the respondent from the hearing, and the Panel will enter into closed deliberation to determine an appropriate formal sanction (see §2.04(b) of the Student Disciplinary Procedures) for the respondent. The Panel may also issue educational sanctions and apply additional conditions or restrictions set forth in §2.04(c) of the Student Disciplinary Procedures. The Panel will also compose a rationale for their sanctioning decision.

(h) Notice of Action Taken. OSCR staff will provide email notification of the Panel's decision, including a rationale, to both the respondent and the complainant as soon as possible, usually by the end of the next business day. This notification will also include information regarding the parties' right to appeal the Panel's decision.

(i) Special Hearing Procedures.

(1) Expedited Case Disposition. If, during the investigation, the respondent admits the allegations and Student Code violations, the investigator may offer the respondent an Expedited Case Disposition (ECD), which will include a description of the behavior, a waiver of the right to a formal hearing, a waiver of the right to appeal, specific responsibility determinations, and a set of sanctions and/or behavioral restrictions. If the respondent accepts and signs the offer, the investigator will also share the offer with any participating complainants. If they also accept and sign the offer, the investigator will present the ECD to a Panel of the Subcommittee on Sexual Misconduct for ratification. If the Panel ratifies the ECD by simple majority vote, OSCR staff will notify the signatories, and the decision described in the ECD will be final. If the Panel does not ratify the ECD, the case will proceed according to the investigation and hearing procedures described above.

(2) Sanction-Only Hearing (One-Phase Hearing). If the respondent admits the allegations and Student Code violations, they may request in writing that the hearing described above proceed immediately to Phase Two. The Panel Chair will confirm, on the record, that the

respondent is accepting responsibility. If the respondent so confirms, the Panel Chair will proceed accordingly.

## Section 8: Appeal Procedures

(a) Right to Appeal. Both the respondent and the complainant have the right to appeal the Panel's decision. The Dean of Students may also appeal the decision on behalf of the university.

(b) Grounds for Appeal. The appellant must base the appeal exclusively on one or more of the following grounds:

    (1) The investigation and/or the hearing was not conducted fairly or in conformity with prescribed university procedures. The appellant must show that any alleged bias or deviation from the Student Disciplinary Procedures, including this appendix, is likely to have adversely affected the outcome of the original hearing.

    (2) Any sanctions imposed by the Panel were not appropriate for the violation(s) for which the student was found responsible.

    (3) New, substantive information, sufficient to alter the decision, exists and was clearly not available at the time of the original investigation and/or the hearing.

(c) Notice of Appeal. The appellant must submit a Notice of Appeal and all supporting documentation to the Office for Student Conflict Resolution within five business days of the date of notice of the Panel's decision. The appellant may submit a written request to extend this deadline, and upon showing good cause, the Executive Director may grant such an extension.

(d) Content of Notice of Appeal. The Notice of Appeal must contain at least the following: (1) specific grounds for appeal; (2) specific outcome requested; and (3) the appellant's reasons in support of the grounds identified and outcome requested. The appellant must submit the Notice of Appeal in writing and with the appellant's signature. Oral appeals are not accepted. If only one party submits a Notice of Appeal, OSCR will notify the other party of the submission and grant the other party access to all submitted documentation. The other party will have five business days from the date of notification to submit a written response to be considered as part of the appeal. If both parties submit a Notice of Appeal, both parties will be informed, granted access to all submitted documentation, and given five business days to submit a written response.

(e) Sanction Held in Abeyance Pending Appeal. The effective date of any formal or educational sanction will be held in abeyance automatically during the period in which the appeal may be filed and, once an appeal is filed, until the committee reaches a decision on the appeal; however, the Executive Director has the discretion to require that certain behavioral restrictions, such as no contact directives, remain in place pending the appeal.

(f) Appellate Review.

    (1) The Chair of the SCSD or their designee will identify three SCSD members, of which one must be a faculty member and one must be a student, to consider any appeals of the Panel's decision. These individuals will constitute the Appeal Committee. Before the membership of this Appeal Committee is finalized, OSCR will provide both the respondent and the complainant with a list of all members of the SCSD. At this point, the respondent and complainant may challenge the objectivity of any person on this list. Such a challenge must be based on a conflict of interest (e.g., a prior relationship that may result in bias). The Chair of the SCSD or their designee will consider these challenges when making a final decision regarding Appeal Committee membership. Prior to serving on an Appeal Committee, all members will have received appropriate annual training, developed in consultation with the

university's Title IX Coordinator, on sexual harassment, sexual assault, sexual exploitation, stalking, dating violence, domestic violence, and the physiological and psychological effects of trauma. If the Chair of the SCSD does not serve on the Appeal Committee, they or their designee will select a faculty member to chair the Appeal Committee.

(2) The Appeal Committee will review all materials that were provided to the Panel, the recording of the hearing, the Notice(s) of Appeal, any documentation provided in support of the Notice(s) of Appeal, and any responses to the Notice(s) of Appeal in a timely manner.

(3) The Appeal Committee will meet to consider the appeal and will be advised by the Executive Director or their designee, who will not be allowed to vote. Neither the respondent nor the complainant will be allowed to attend the deliberations of the Appeal Committee, but the Executive Director may be present or authorize other non-voting parties, such as University Counsel, to be present in an advisory role.

(g) Deliberations. The Appeal Committee will decide by simple majority vote whether the appellant has met any of the grounds for appeal. The decision of the Appeal Committee is final and binding on all parties.

(h) Authority of the Appeal Committee. If the Appeal Committee determines that one of the three grounds for appeal has been met, the Appeal Committee may:

(1) Affirm the Panel's decision;

(2) Modify the Panel's decision;

(3) Remand the case to the original Panel (with instruction) or a new Panel (with or without instruction) for a new hearing; and/or

(4) Modify any sanctions imposed.

(i) Notice of Decision. OSCR will communicate the decision to the respondent and the complainant within five business days of the date the Appeal Committee reached its decision.

(j) Appeal Timeline. The anticipated duration of the appeal process is 20 business days. If the time between OSCR's receipt of the Notice of Appeal and the final decision will substantially exceed this estimate, OSCR staff will notify both the respondent and the complainant of the delay and the reason for the delay.

## Section 9: Petitions to the Subcommittee on Sexual Misconduct

(a) Persons who have been dismissed from the university for disciplinary reasons may petition for permission to re-enter the university.

(b) A petitioner is not a member of the university community. Petitioners must demonstrate that they are fit to return to the academic community, not simply that they have completed all listed sanctions in the dismissal letter.

(c) In order for a petition to be considered:

(1) The petition must be filed before November 1 for fall petition requests and before March 15 for spring requests;

(2) The petitioner must provide documentation that all educational requirements and conditions have been fully and completely satisfied.

(d) This petition should minimally include:

   (1)   A description of the incident(s) for which the sanction was assigned and the responsibility the student had in the violation;

   (2)   A description of the behavioral changes the petitioner has made since the incident(s) and completion of the sanction(s);

   (3)   The petitioner's anticipated graduation date and the career and/or additional education plans he/she has following graduation.

(e)  The Executive Director or their designee will appoint a Panel composed of three members of the Subcommittee on Sexual Misconduct to hear the petition. At least one student must be appointed to the Panel. If the respondent is a graduate student, the Panel will include a representative of the Graduate College as a non-voting member. Once appointed, voting Panel members will select a faculty or staff member to serve as Chair.

(f)  Both the petitioner and the complainant will be invited to appear in person before the Panel to discuss the petitioner's request for readmission in statements of ten or fewer minutes in duration. All participants may be accompanied by an advisor to the petition hearing, but this advisor may not actively participate in the petition hearing. Both petitioners and complainants have the option of participating in the process over the phone, by video conference, or in person. Any witness testimony may be presented by written statement only.

(g)  Both the petitioner and the complainant will be given an opportunity to challenge the objectivity of any Panel member. Such a challenge must be based on a conflict of interest (e.g., a prior relationship that may result in bias).

(h)  The complainant and the petitioner will present their statements to the Panel separately, with the complainant being invited to present their statement first.  Neither the complainant nor the petitioner will be present while the other is making their statement.

(i)  Petitions to the subcommittee may not be appealed by the petitioner or the complainant and are not audio recorded.

(j)  The Panel will make its decisions by simple majority vote.

(k)  The Panel may:

   (1)   Deny the petition and assign a new date and new requirements for the next consideration of the petition;

   (2)   Grant the petition and allow the petitioner to pursue the readmission process.

(l)  Petitioners granted permission to pursue readmission are assigned the formal sanction of Conduct Probation until Graduation, unless a Panel determines strong mitigating factors warrant a lesser formal sanction. The Panel may also issue behavioral restrictions or educational sanctions that they deem appropriate.

(m) The Panel's decision to grant the petitioner the right to pursue the readmission process does not abrogate the right of any college to deny readmission on the basis of scholarship.

## Section 10: Additional Responsibilities of the Title IX Coordinator in the Student Discipline System

(a)  Advisory Role of the Title IX Coordinator. The Executive Director and the investigators may seek advice from the Title IX Coordinator or their designee regarding investigations, possible interim measures or other remedies, training, and compliance with Title IX and other federal, state, or local laws and regulations.

(b) Review by Title IX Coordinator. The Title IX Coordinator or their designee will review all sexual harassment, sexual assault, sexual exploitation, stalking, dating violence, and domestic violence cases upon their completion to determine whether the university needs to take additional action that was not available through the disciplinary process.

## Section 11: Privacy

(a) Any proceeding, meeting, or hearing held as part of the process described in this appendix will protect the privacy of the participating parties and witnesses.

(b) The university will not disclose the identity of the respondent or any complainants, except as necessary to investigate the allegations or to implement interim protective measures and accommodations or when provided by state or federal law.

## Section 12: Conflicts of Interest and Bias

(a) Any OSCR staff member, investigator, Subcommittee on Sexual Misconduct member, or SCSD member who has a conflict of interest with respect to a specific case must recuse themselves from any role in that case.

(b) Any OSCR staff member, investigator, Subcommittee on Sexual Misconduct member, or SCSD member who has a bias for or against any respondent or complainant in a specific case must recuse themselves from any role in that case.