E-FILED
Thursday, 05 January, 2023  09:34:44 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

|  |  |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) **Case No: 22-cv-2197** |
| | ) |
| v. | ) |
| | ) **Hon. Joe Billy McDade** |
| | ) **Magistrate Jonathan E. Hawley** |
| BOARD OF TRUSTESS OF THE | ) |
| UNIVERSITY OF ILLINOIS | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Plaintiff John Doe ("Plaintiff" or "Doe") was an undergraduate student at the University of Illinois at Urbana Champaign ("UIUC") during the 2019-2020 school year. Based on a sexual encounter with another student on February 14, 2020, Plaintiff was accused of sexual assault. Pursuant to its policies, UIUC investigated and adjudicated the accusation, including a live hearing before a three-person hearing panel, which found Plaintiff responsible for sexual assault and entered a sanction of a two-year dismissal from UIUC on August 20, 2020. Plaintiff appealed, that appeal was denied, and Plaintiff was dismissed from UIUC. Plaintiff now challenges that decision in a four-count complaint alleging claims for due process, Title IX gender discrimination, breach of contract, and a stand-alone declaratory judgment claim.

The Complaint names UIUC's Board of Trustees as a defendant, which cannot be sued under Section 1983 and is not subject to suit in federal court for a Due Process claim under the Eleventh Amendment. For those reasons, Count I must be dismissed for lack of jurisdiction

pursuant to Rule 12(b)(1). The Complaint does not allege required elements of any of the asserted claims and must be dismissed in its entirety for failure to state a claim pursuant to Rule 12(b)(6).

## FACTS ALLEGED

I.    **UIUC's Sexual Misconduct Policy and Procedures Applicable to Alleged Sexual Misconduct Policy Violations.**

UIUC maintains and enforces a Sexual Misconduct Policy ("Policy"), which is contained in its Student Code ("Code"). *See* Compl. ¶¶ 36-37; Ex. A at § 1-111.[1] The Policy defines key terms, including a definition of "sexual misconduct" that includes "sexual assault," and a definition of "sexual assault" as "any sexual conduct that does not involve the knowing consent of each person, including any form of sexual penetration without consent …." Compl. ¶ 41; Ex. A at § 1-111(c)(1)-(2). The Code informs students that they will be subject to discipline for conduct that violates the Policy, including sexual assault. Compl. ¶ 40; Ex. A at § 1-301(h).[2]

UIUC investigates and resolves alleged Policy violations pursuant to the procedures contained in its Student Conduct Protocol for Allegations of Sexual Misconduct, Including Sexual Harassment, Sexual Assault, Sexual Exploitation, Stalking, Dating Violence, and Domestic Violence ("Protocol"). Compl. ¶ 46; Ex. B. The Protocol in effect at the time of the charges against Plaintiff (attached as Appendix D to the Student Disciplinary Procedures) provided repeated opportunities for the parties to present their side of the story. Compl. ¶¶ 8, 49, 51-53, 57, 58-63, 66; Ex. B at Sections 4-7. The parties could:

- Repeatedly convey information to two investigators, including in their own interviews and follow up interviews and identify documents and witnesses for the investigators to collect and interview. Compl. ¶¶ 49, 51, 52, 53, 57; Ex. B at Sections 4(c), (d), (e).
- During the investigation, review the evidence and submit follow-up questions for the investigators to ask the other party. Compl. ¶ 8.

---

[1] The Complaint, with its Exhibits A & B, is attached here as Exhibit 1.
[2] Exhibit A to the Complaint contains select pages of the Code; section 1-301(h) can be found here: https://studentcode.illinois.edu/article1/part3/1-301/.

- At the conclusion of the investigation, review all evidence collected and submit a written response. Compl. ¶ 58; Ex. B at Sections 5(a)-(b).
- After the investigators prepared an Investigative Report summarizing the investigation and evidence collected, review and submit a written response to the Investigative Report as well. Compl. ¶¶ 60, 61; Ex. B at Section 6(a)-(b).
- Appear at a "Formal Hearing" before a three-member adjudicating panel, which was advised by the Director of OSCR or their designee, during which each party and participating witnesses presented live testimony, and each party could propose cross-examination questions for the hearing panel chair to pose. Compl. ¶¶ 62-63, 66; Ex. B at Section 7(f).

After hearing testimony and reviewing all evidence, the hearing panel deliberates in closed session to find facts and determine whether a respondent is responsible for a policy violation, under a preponderance of the evidence standard. Compl. ¶ 68; Ex. B at Section 7(f)(10). If the respondent is found responsible, the hearing panel would conduct a "Phase Two" hearing to determine sanctions. Ex. B at Sections 7(f)(11), 7(g). A respondent could appeal to a separate panel. Compl. ¶ 71; Ex. B at Sections 8(a), 8(f)(1).

## II. The Sexual Assault Complaint Against Plaintiff and Plaintiff's Dismissal from UIUC.

Plaintiff, a former student at UIUC, met Jane Roe, a fellow undergraduate student and member of the same athletic team, in the fall 2019 semester. Compl. ¶ 24-27. The sexual encounter at issue occurred on February 14, 2020. *Id.* at ¶ 2. That night, Plaintiff and Jane went to a bar, consumed alcohol and left together; Plaintiff walked Jane back to his apartment. *Id.* at ¶¶ 2, 28, 29. Plaintiff and Jane went into Plaintiff's bedroom, where Jane asked for a shirt and told Plaintiff she wanted to go to bed. *Id.* at ¶ 30. After Jane got into bed, Plaintiff began to kiss her. *Id.* at ¶ 31. Jane asked Plaintiff if he had a condom, and he responded he did not. *Id.* Plaintiff offered varying accounts of his conversation with Jane after she learned he did not have a condom, as described in more detail below and reflected in documents referenced in the Complaint and attached here as

Exhibits 2-3.[3] Plaintiff and Jane then engaged in sexual intercourse. *Id.* at ¶ 33. The same night

Jane left Plaintiff's apartment, she reported the incident to the police and sought medical care. *Id.*

at ¶ 34; Investigative Report, Exhibit 2 pp. 11, 13, 14; Decision Letter, Exhibit 3 p. 3.

    A few hours after the sexual encounter, police questioned Plaintiff in his apartment

building. Ex. 2 p. 12; Ex. 3 p. 2.  He told one officer that Jane did not feel comfortable with his

not having a condom and when she ultimately agreed to continue without one, she told him to be

careful. Ex. 3 p. 2. He told a second police officer that when Jane learned he did not have a condom,

she joked about him buying her Plan B the next day. *Id.* Within a matter of days, when questioned

by the Department of Intercollegiate Athletics ("DIA") personnel, Plaintiff said that he used a

condom and provided a written statement stating the same. Ex. 2 p. 13, Appendix D; Ex. 3 p. 2.

    On or about February 27, 2020, Plaintiff received notice that a sexual assault complaint

had been made against him. Compl. ¶ 6. Plaintiff was interviewed four times on March 26, April

15, June 4, 2020, and July 16, 2020, and Jane was interviewed twice on February 27 and April 16,

2020. Ex. 2 pp 2, 5-8. The investigators conducted witness interviews and obtained electronic

communications, video evidence, medical documentation, and information supplied by law

enforcement. Compl. ¶ 7; *see also* Ex. 2. As part of the investigation, both Plaintiff and Jane had

the opportunity to review the evidence, provide clarifying comments, and submit follow-up

questions for the investigators to ask the other party. Compl. ¶¶ 8, 129(d), 139(d); *see also* Ex. 2.

At the end of the investigation, the investigators prepared a final Investigative Report recounting

the evidence, including Plaintiff's varying statements about his discussion with Jane, which was

---

[3]Although evaluation of a motion to dismiss for failure to state a claim is generally limited to review of the facts alleged, "[d]istrict courts may … consider … documents attached to a motion to dismiss when they are referenced in the complaint and central to the plaintiff's claim." *Lax v. Mayorkas*, 20 F.4th 1178, 1181 n.1 (7th Cir. 2021). To the extent that such a document conflicts with the allegations of the complaint, the document controls. *See Massey v. Merrill Lynch & Co.*, 464 F.3d 642, 645 (7th Cir. 2006). The Complaint references the Investigative Report (Compl. ¶ 9) and the Subcommittee's decision letter (Compl. ¶¶ 10-13, 18).  The Investigative Report (including Appendix D to that report) and the Subcommittee's August 20, 2020 decision letter are attached as Exhibits 2 and 3, respectively.

provided to members of the Subcommittee on Sexual Misconduct. Compl. ¶ 9; Ex. 2. A hearing before the Subcommittee was held on August 19, 2020. Compl. ¶¶ 9, 66; Ex. 3 p. 2. Jane did not appear at the hearing. Compl. ¶ 66; Ex. 3 p. 3.

Following the hearing, and after considering the evidence, including the Investigative Report, documents, and witness testimony, the Subcommittee issued a written determination regarding the charge against Plaintiff. *See* Compl. ¶¶ 9, 10; Ex. 3. In a written decision letter issued by the Subcommittee on August 20, 2020, the Subcommittee determined that:

- After consuming alcohol together at a bar, Plaintiff walked Jane to his apartment;
- While there, they went into Plaintiff's bedroom and Jane asked Plaintiff for a shirt;
- Jane told Plaintiff that she wanted to go to bed;
- Jane asked Plaintiff if he had a condom and he answered he did not; Jane indicated she did not think the two of them should "do this," but nevertheless, Plaintiff had sex with Jane.
- The Subcommittee found that Plaintiff did not have Jane's consent for the sexual intercourse.
- The Subcommittee also found that after intercourse, Plaintiff asked Jane to perform oral sex and she did.

Compl. at ¶¶ 10, 30, 31; Ex. 3 p. 2. Based on these findings, namely, that Plaintiff did not obtain consent from Jane to engage in sexual intercourse, the Subcommittee found Plaintiff responsible for sexual assault. Compl. ¶¶ 11-12; Ex. 3 pp. 2-3. The Subcommittee found Plaintiff not responsible for a fourth charge, based on an absence of evidence that Plaintiff threatened Jane. Ex. 3 p. 3. The Subcommittee explained that in reaching its determination, it was unfortunate that they were unable to question Jane directly, but they determined that the record of the case gave them enough information to evaluate the credibility of her narrative objectively. Compl. ¶¶ 13, 18; Ex. 3 p. 3. Specifically, the Subcommittee's written description of Plaintiff's statements included:

- Plaintiff's own "account has not been consistent";
- In conversation with one police officer, Plaintiff "indicated that the complainant did not feel comfortable with his not having a condom and that, when she ultimately agreed to continue without one, she told him to be careful";
- In conversation with second police officer, Plaintiff stated "when the complainant learned he did not have a condom, she joked about his buying her Plan B the following day";

- "When questioned about this discrepancy in the hearing, the respondent did not dispute the accuracy of the officers' reports and explained that he had forgotten about the Plan B comment when he spoke" to the first police officer;
- "However, we find the description of the complainant's demeanor to be quite different between these two statements and do not believe it is explained entirely by forgetfulness. . . . we believe this call's [sic] the credibility of the respondent's narrative into account"
- In addition, "[b]y the respondent's own admission, he knowingly provided false information to DIA when he stated that he wore a condom during the incident. Although he does provide an explanation for his deceit, this fact does call his credibility into question."

Ex. 3 pp. 2-3. The Subcommittee also wrote the following about complainant's statements during the investigation:

- "It is unfortunate that we were unable to question her directly, but we believe that the record of the case gives us enough information to evaluate the credibility of her narrative objectively";
- "the complainant's various statements have a very high degree of consistency";
- "her negative reaction to the sexual encounter was observed by multiple witnesses, corroborated by a text conversation, and supported by the steps she took to report the incident to the police and to seek medical evaluation";
- "although a negative, even traumatic, reaction to an incident does not demonstrate a policy violation, we do believe, based on the information cited, that it was a genuine reaction and honestly described."

*Id.* The Subcommittee then explained that, for these reasons and based on its examination of the material and testimony provided to it and applying the preponderance of the evidence standard, it found Jane's narrative more credible than Plaintiff's varying accounts. Compl. ¶ 13; Ex. 3 p. 3. Plaintiff was dismissed from UIUC, told he could petition for readmission after two years, and informed of his right to appeal. Compl. ¶ 12; Ex. 3 pp. 3-5.

Plaintiff did appeal the Subcommittee's decision to the Senate Committee on Student Discipline ("SCSD"). Comp. ¶ 14. The SCSD met on September 18, 2020 regarding Plaintiff's appeal. *Id.* The SCSD examined the written appeal and record of the case and concluded that none of the criteria for appeal were substantially met; that is, the SCSD found no evidence of bias, conflicts of interest, new information, or procedural error. *Id.* at ¶ 15. Accordingly, the SCSD

affirmed the Subcommittee's decision. *Id.* at ¶ 16. Accordingly, Plaintiff was dismissed from UIUC for two years effective September 18, 2020, with the ability to pursue readmission in two years and after satisfying the sanctions issued. *Id.* at ¶¶ 12, 16; Ex. 3 pp. 3-4.

On September 16, 2022, two years after his dismissal, Plaintiff filed this Complaint challenging the propriety of UIUC's dismissal decision. The Complaint asserts four counts against the Board:  violation of Plaintiff's right to due process under the Fourteenth Amendment (Count I); violation of Title IX of the Educational Amendments of 1972 ("Title IX") (Count II); a state law claim for breach of contract (Count III); and a claim for declaratory judgment (Count IV).

## ARGUMENT

### I.      Standard of Review

A motion to dismiss under Rule 12(b)(1) asserts that the Court does not have jurisdiction over some or all of the subject matter of the complaint. Fed. R. Civ. P. 12(b)(1). "In the face of the motion to dismiss under Rule 12(b)(1), Plaintiff bears the burden of persuading the Court that subject-matter jurisdiction exists." *Lohrasbi v. Bd. of Trs. of Univ. of Ill.*, No. 13-3105, 2014 WL 12743795, at *2 (C.D. Ill. Feb. 6, 2014); *see* Fed. R. Civ. P. 12(h)(3). A motion under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Mutter v. Madigan*, 17 F. Supp. 3d 752, 757 (N.D. Ill. 2014).  To survive dismissal, a complaint must be supported by allegations that, if taken as true, plausibly suggest that the plaintiff is entitled to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). The Court must accept the well-pleaded allegations in the complaint as true; however, legal conclusions and conclusory statements are not taken as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where the well-pleaded facts do not permit the Court to infer more than the possibility of misconduct, the complaint has not shown that the pleader is entitled to relief as required by Rule 8. *Id.* at 679.

## II.     Plaintiff's Due Process Claim Against the Board (Count I) Must Be Dismissed.

### A.  Plaintiff's Due Process Claim Must Be Dismissed Under Rule 12(b)(1) for Lack of Jurisdiction.

As an initial matter, Plaintiff's Due Process claim against the Board must be dismissed for lack of jurisdiction pursuant to Rule 12(b)(1). The Board, "as part of the State, is not a 'person' capable of being sued for damages under [42 U.S.C.] § 1983." *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 391 (7th Cir. 2020). In addition, the Eleventh Amendment bars federal lawsuits against state agencies, including state universities and their governing bodies, and official-capacity claims against state officials, with only three exceptions: (1) Congress can validly abrogate a state's immunity; (2) a state can consent to the suit; or (3) under the *Ex parte Young* doctrine, a private party can sue individual state officials for prospective relief to enjoin ongoing violations of federal law. *Council 31 of AFSCME v. Quinn*, 680 F.3d 875, 882 (7th Cir. 2012). As none of these exceptions apply to Plaintiff's claims against the Board, Plaintiff's Due Process claim against the Board is barred by the doctrine of sovereign immunity and must be dismissed. *See Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 403 (7th Cir. 2018).

### B.  Plaintiff's Due Process Claim Must Be Dismissed Under Rule 12(b)(6) for Failure to State a Claim.

In addition, Plaintiff's Due Process claim must be dismissed under Rule 12(b)(6) for failure to state a claim. To state a procedural due process claim, Plaintiff must allege that (1) he was deprived of a cognizable property or liberty interest, and (2) the procedures by which he was deprived of that interest did not satisfy constitutional requirements. *See Doe v. Purdue Univ.*, 928 F.3d 652, 658-59 (7th Cir. 2019) ("*Purdue I*"). Plaintiff has not sufficiently alleged either element.

#### 1.  Plaintiff Fails to Identify a Cognizable Property Interest.

As an initial matter, the Complaint contains factual allegations that do not apply to Plaintiff. He asserts a "constitutionally protected property interest in his degree, which he completed and

earned, and relied upon, and continues to rely upon, for his employment and immigration status…", as well as a property interest in his employment and immigration status. Compl. ¶¶ 88-89, 91, 95. However, the Complaint contains no allegations that Plaintiff is an immigrant, is employed, or has completed his degree from UIUC[4], much less that UIUC's disciplinary actions interfered with such interests. Rather, these allegations (along with others) appear to have been copied verbatim from a prior, entirely separate lawsuit filed by a different student who had been disciplined by UIUC for sexual misconduct. *See Doe v. Bd. of Trs. of Univ. of Ill*., Case No. 2:19-cv-02054 ("Doe I"), Dkt. 1 at ¶¶ 119-120, 122 (C.D. Ill. Mar. 6, 2019). Because Plaintiff has not pled that he has a degree, immigration status, or job that UIUC allegedly deprived him of, he cannot state a due process claim based on these alleged interests.

Other aspects of the Complaint that do relate to Plaintiff's own situation fail to satisfy clearly established requirements for pleading a property interest in the Seventh Circuit. Plaintiff seeks to assert a property interest in his "continued studies" at UIUC. Compl. ¶¶ 95, 96. The Seventh Circuit has clearly held that college students do not have "a stand-alone property interest in an education at a state university." *Malhotra v. Univ. of Ill.*. No. 2:21-cv-02220, 2022 WL 3576242, at *2 (C.D. Ill. July 19, 2022) (quoting *Charleston v. Bd. of Trs. of Univ. of Ill. at Chi.*, 741 F.3d 769, 772-73 (7th Cir. 2013)). Rather, in this context, "any property interest is a matter of contract between the student and the university." *Purdue I*, 928 F.3d at 660. To establish a property interest, a student must do more than allege the existence of a contract – he must "establish that the contract entitled him to the specific right that the university allegedly took": "the right to a continuing education." *Malhotra*, 2022 WL 3576242, at *3 (quoting *Purdue I*, 928 F.3d at 660). The student "must be specific about the source of this implied contract, the exact promises the

---

[4] Indeed, Plaintiff alleges that he "would have continued" his studies at UIUC "but for [his] dismissal." Compl. ¶ 94.

university made to the student, and the promises the student made in return." *Id.* (quoting *Charleston*, 741 F.3d at 773). The Complaint fails to point to any contractual entitlement to a continuing education at UIUC.

The factual allegations of the Complaint include excerpts from the Code, Student Disciplinary Procedures and Protocol, which Plaintiff may attempt to rely upon to assert such a specific contractual entitlement. These provisions provide that:

- Members of the UIUC community "have at least the rights and responsibilities common to all citizens," and "affiliation with the University as a student does not diminish the rights or responsibilities held by a student … as a citizen of larger communities of the state, the nation, and the world". Compl. ¶ 75(a).

- The enumeration of rights in the Code "shall not be construed to deny or disparage other rights retained by these individuals in their capacity as members of the campus community or as citizens of the community at large. Compl. ¶ 75(b).

- "The Trustees asserted their belief in the concept that the University discipline system shall be separate from, but coexistent with general systems established by society to deal with the conduct of citizens of society." Compl. ¶ 78.

These provisions lack any specific promise about how or why a student may or may not be dismissed. They are all general statements about rights all community members have within the UIUC community and UIUC's disciplinary system; they do not (individually or together) amount to an entitlement to a continuing education. Moreover, Plaintiff offers no allegations to specify how UIUC failed to honor the above general "promises" with respect to his disciplinary procedure. These allegations cannot create a property interest.

Plaintiff also asserts that he was entitled to "process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing," and "fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct," and that UIUC violated his due process rights by depriving him of "the minimal requirements of procedural fairness." Compl. ¶¶ 96-98. It appears with these allegations that

10

Plaintiff claims he had a due process right to the disciplinary process set forth in the Protocol – that is, that UIUC conferred on him certain procedural rights that would apply in a proceeding involving an allegation of sexual misconduct. Such a claim, to the extent Plaintiff asserts it, fails because "the Seventh Circuit has held 'many times' that 'a plaintiff does not have a federal constitutional right to state-mandated process.'" *Malhotra v. Univ. of Ill. at Urbana-Champaign et al.*, 2:21-cv-02220-JBM-JEH, slip op. at *6 (C.D. Ill. Mar. 8, 2022) (quoting *Charleston*, 741 F.3d at 773).[5]

### 2.  Plaintiff Fails to Identify a Cognizable Liberty Interest

Plaintiff also generally asserts that he had a liberty interest "in pursuing his education as well as in future educational and employment opportunities and occupational liberty." Compl. ¶ 87. The Complaint's only other reference to this concept is to his "fundamental right to liberty in his good name, reputation, and employment." *Id.* at ¶ 130. These bare allegations are not enough.

The Seventh Circuit has held that "the loss of reputation is not itself a loss of liberty, even when it causes serious impairment of one's future employment." *Purdue I*, 928 F.3d at 662 (citation and internal quotation marks omitted); *see also O'Gorman v. City of Chi.*, 777 F.3d 885, 891 (7th Cir. 2015); *Paul v. Davis*, 424 U.S. 693, 712 (1976); *Hinkle v. White*, 793 F.3d 764, 767-68 (7th Cir. 2015). Furthermore, while the Seventh Circuit has recognized that university students may have an "occupational liberty" interest, the limited circumstances in which such an interest can exist are not present here. *See Purdue I*, 928 F.3d at 661-62. To state a claim for deprivation of occupational liberty, a plaintiff must satisfy a "stigma-plus test" by alleging that (1) the state disclosed information that damaged his reputation, (2) the reputational harm made it "virtually impossible" for him to find employment in his chosen profession, and (3) his legal status was

---

[5] A copy of this order is attached as Exhibit 4.

altered, depriving him of a previously held right. *See Doe v. Trs. of Ind. Univ.*, 496 F. Supp. 3d 1210, 1216 (S.D. Ind. 2020) (citing *Purdue I*, 928 F.3d at 661). The publication requirement of the stigma-plus test is met when disclosure of damaging information is (1) "compelled," (2) "certain," and (3) "not self-published." *Id.* (citing *Purdue I*, 928 F.3d at 662). Notably, dissemination by the defendant and not by the plaintiff is a strict requirement in this Circuit. *Id.* (citing *Olivieri v. Rodriguez*, 122 F.3d 406, 408–409 (7th Cir. 1997)). Thus, in *Purdue I*, the publication requirement was satisfied because the plaintiff-student was in a Navy ROTC program and had a "legal obligation to authorize the disclosure" of his sexual misconduct finding to the Navy, his future employer. *Purdue I*, 928 F.3d at 662.

Here, Plaintiff fails to allege any element of the stigma-plus test. He does not allege that UIUC has disclosed his disciplinary record or that it has any legal obligation to do so to anyone. Further, he does not allege facts to suggest that the reputational harm that might result from such disclosure makes it virtually impossible for him to find employment in his chosen profession. The mere implication that Plaintiff might possibly be required to disclose his disciplinary record in connection with a hypothetical future job application is insufficient to satisfy the stigma-plus test as a matter of law. *See Ind. Univ.*, 496 F. Supp. 3d at 1216-17 (no liberty interest for student seeking business management career because any disclosure of disciplinary record during graduate school application would be voluntary). Accordingly, Plaintiff fails to sufficiently plead a cognizable liberty interest of which he was allegedly deprived.

### 3.  UIUC Afforded Plaintiff All Process Required By Law.

Even if Plaintiff had a cognizable property or liberty interest, the Complaint lacks any alleged actionable deprivation of such interest by UIUC with respect to his disciplinary proceeding. Plaintiff presents a myriad of vague assertions regarding his proceeding that do not

actually describe what happened in his own case but were copied verbatim from another student's prior lawsuit against UIUC. Such allegations are squarely contradicted by his own admissions elsewhere in the Complaint that do address his own situation.

For instance, Plaintiff alleges he was denied "a meaningful opportunity to be heard by those making the decision on credibility," though he had a hearing and clearly testified before a hearing panel. Compl. ¶¶ 9, 101. He also claims he was denied the opportunity "to challenge the credibility of … adverse witnesses" other than Jane, to "present evidence and witnesses in support of his defense," and to "present his defense to the Panel" because UIUC "conducted a superficial and secretive hearing." *Id.* at ¶ 101. But there was no "secret" hearing:  Plaintiff reviewed all of Jane's investigation testimony and all other evidence, and he was present for the hearing and presented his defense in person. *Id.* at ¶¶ 8-9, 66, 129(d), 139(d); Ex. 3 (referencing Plaintiff's testimony at the hearing).  He further alleges that UIUC "failed to provide Plaintiff with a fair and reasonable opportunity to defend himself and arrived at a predetermined, arbitrary and unwarranted decision." Compl. ¶ 102. These allegations are contradicted by more specific allegations of his Complaint, in which Plaintiff:

- Identifies the applicable procedures, which included written notice to a respondent of the allegations; an investigation during which two investigators interviewed the parties and other witnesses, conducted follow-up interviews, and gathered evidence, and the parties had the opportunity to provide information and documentation and identify witnesses; the preparation of an initial report based on the investigation, which the parties had the opportunity to review and respond to; the preparation of a final report which the parties had the opportunity to review and respond to; the preparation of a final investigation report at the conclusion of this process; a formal hearing before a three-member panel of the Subcommittee; and the right to appeal the panel's decision. Compl. ¶¶ 46, 49, 50-53, 57-63, 70-71.

- Admits that he received notice of the charges against him and, in his disciplinary proceeding, he was interviewed by investigators, who conducted witness interviews and gathered extensive evidence in the form of electronic communications, video evidence, medical documentation, and information supplied by law enforcement; he and Jane both had the opportunity to review the evidence gathered, provide clarifying comments, and

submit follow-up questions to ask the other party; and that "a hearing was provided for [Plaintiff and Jane]." Compl. ¶¶ 6-8, 66.

- Admits that, in reaching its determination following the hearing, the Subcommittee considered the investigation report, documents, and witness testimony; the Subcommittee made findings of fact regarding the sexual encounter at issue, including that Plaintiff did not have consent to engage in sexual intercourse with Jane; the Subcommittee's finding that Plaintiff violated the Code was based on these findings of fact; the Subcommittee provided a written rationale explaining its findings, and specifically explained that it relied on its examination of the record of the case and applied the preponderance of the evidence standard in finding that Jane's narrative was more credible that Plaintiff's even though it was unable to question Jane directly. Compl. ¶¶ 9-13, 18.

- Admits that Plaintiff had the opportunity to appeal the Subcommittee's decision and did appeal that decision; and a separate appellate panel affirmed the Subcommittee's decision based on its examination of the written appeal and record of the case. Compl. ¶¶ 14-16.

Again, these contradictions within Plaintiff's own Complaint arise because Plaintiff has copied from prior complaints in other matters involving claims by other students. *See* Compl. ¶¶ 101-102; *Doe I*, Dkt. 1 at ¶¶ 132-33 (Mar. 6, 2019); *Doe v. Bd. of Trs. of Univ. of Ill.*, Case No. 2:17-cv-02180 ("Doe II"), Dkt. 8 at ¶¶ 156-57 (C.D. Ill. Aug. 23, 2017). Accordingly, because allegations borrowed from other student cases are inapplicable here and contradicted by Plaintiff's own admissions and the Subcommittee's decision letter upon which this Complaint specifically relies, Plaintiff's conclusory allegation that he was not permitted to directly address or present his defense to the Subcommittee that made the decision regarding Jane's complaint must be disregarded.

Moreover, when stripped of inapplicable procedural assertions, Plaintiff's due process claim boils down to asserting due process was absent because Jane did not appear at the hearing, which prevented Plaintiff from proposing questions for the panel to ask her at that hearing. But, the Seventh Circuit has never required cross examination for a student disciplinary proceeding to satisfy due process. *Purdue I,* 928 F.3d at 664, n.4 (declining to address this issue). Instead, as one Judge in this District has emphasized in considering the constitutionality of UIUC's sexual misconduct procedures, "[t]o comport with due process, expulsion procedures must provide a

student with a meaningful opportunity to be *heard*." *Doe II*, No. 17-cv-2180, 2018 WL 11269804, at *11 (C.D. Ill. July 24, 2018) (citing *Remer v. Burlington Area Sch. Dist*., 286 F.3d 1007, 1010 (7th Cir. 2002) (emphasis in original). The *Doe II* decision also clarified as follows regarding cross examination and due process requirements:

> The court does not believe that Defendant needs to implement a full blown criminal trial with counsel, the right to cross examine witnesses, or the reasonable doubt standard, but, at the very minimum, an accused party should be able to present his or her case to the person or people who *actually decide their fate*.

*Id.* at *12 (emphasis in original). Plaintiff was, as the Complaint itself alleges, heard multiple times in interviews and at a hearing before the Subcommittee that decided his fate. He also had the opportunity before that hearing to learn of Jane's statements to investigators and propose questions to be asked of Jane by investigators, all after reviewing all evidence collected. During Plaintiff's opportunity to defend himself at the hearing, the hearing panel asked him to explain his own inconsistent statements on the key issue of consent and found that his own responses contradicted themselves, that he was unable to convincingly explain why, and that Plaintiff lacked credibility on this key issue in multiple ways. That opportunity to be heard with full knowledge of all charges and evidence against respondent satisfies the Seventh Circuit's due process standards.

Furthermore, courts in other circuits have recognized that, where a respondent in student sexual misconduct proceedings admits to facts in question or contradicts a respondent's own denials, cross examination of a complainant is not necessary to satisfy due process. *Doe v. Univ. of Neb.,* 451 F. Supp. 3d 1062, 1123-24 (D. Neb. 2020) (where respondent's testimony and statements prior to hearing interpreted as admitting complainant had not consented to sexual conduct, credibility determination did not require hearing board to hear directly from Jane Roe or to permit respondent to question her) (citing *Flaim v. Med. Coll. of Ohio,* 418 F. 3d 629, 641 (6th Cir. 2005). As demonstrated by the Subcommittee's decision letter, Plaintiff's contradictions of

himself formed the fundamental basis for Subcommittee's credibility assessment, rendering cross-examination of Jane Roe unnecessary to satisfy due process.[6]

Moreover, Plaintiff's claim that UIUC could not have held a hearing pursuant to the Protocol that satisfied due process requirements because Jane did not appear at the hearing (making cross-examination of Jane at the hearing impossible) runs directly contrary to current Department of Education ("DOE") Office for Civil Rights ("OCR") regulations and related guidance. The OCR has stated that parties and witnesses in sexual misconduct cases may decline to participate in a hearing, and, in such cases, higher education institutions are specifically allowed to use prior statements made by such parties or witnesses to determine case outcomes. *See* Aug. 24, 2021 Letter to Students, Educators, and other Stakeholders, available at https://www2.ed.gov/about/offices/list/ocr/docs/202108-titleix-VRLC.pdf. Specifically, the OCR's August 24, 2021 letter states that:

> a decision-maker at a postsecondary institution may now consider statements made by parties or witnesses that are otherwise permitted under the regulations, even if those parties or witnesses do not participate in cross-examination at the live hearing . . . [and] may now consider statements made by the parties and witnesses during the investigation . . . regardless of whether the parties or witnesses submit to cross-examination at the live hearing.

*Id.* (citing *Victim Rights Law Center et al. v. Cardona,* No. 1:20-cv-11104, 2021 WL 3185743 (D. Mass. July 28, 2021) (finding regulation excluding prior statements of party/witness who failed to

---

[6] For many reasons, this case is entirely different from *Purdue I,* in which the Seventh Circuit determined alleged process deficiencies were sufficient to support a due process claim. In *Purdue I,* the hearing panel rendered credibility assessments adverse to the respondent where the respondent did not contradict himself and the complainant did not herself provide *any* direct statement or testimony *at all*, written or oral, either at the hearing or at any prior stage of the proceeding. 928 F. 3d at 664 (noting "[i]t is unclear, to say the least, how [the hearing panel] could have evaluated Jane's credibility"). Here, in contrast, the Subcommittee's decision explained that in evaluating the parties' relative credibility, it considered: that Plaintiff admitted Jane expressed concern about engaging in sexual intercourse; that Jane previously provided multiple direct statements in interviews with investigators that had a high degree of consistency; and that Jane's statements were also consistent with her actions of reporting the assault to police the night in question and seeking medical assistance shortly thereafter; and that Plaintiff, by contrast, admitted making false and contradictory statements to the various authorities to whom he described what happened (including the DIA, police, investigators, and the Subcommittee). Ex. 3 pp. 2-3.

appear at a hearing arbitrary and capricious). If this court were to require cross-examination of complainants at a hearing to satisfy due process as a matter of law, such a ruling would contradict existing DOE standards applicable to all higher education institutions. This provides additional reason not to expand existing Seventh Circuit precedent regarding due process requirements and to dismiss Count I.

### III.     Plaintiff's Title IX Claim (Count II) Must Be Dismissed.

Count II alleges an "erroneous outcome" Title IX claim challenging UIUC's decision finding him responsible for sexual misconduct. To plead such a claim, Plaintiff cannot merely allege that UIUC's decision was wrong; rather, Plaintiff must allege facts which, if true, raise a plausible inference that UIUC's decision was made *on the basis of sex. See Purdue I*, 928 F.3d at 667-69; *Doe v. Columbia Coll. Chi*., 933 F.3d 849, 854-855 (7th Cir. 2019). Here, Plaintiff's claim of gender bias is based solely on allegations that:

- "Plaintiff was wrongfully subjected to a University disciplinary process marred by procedural flaws and sexual bias against males." Compl. ¶ 120.

- "Upon information and belief, Defendant's training materials provided to investigators, the panel and the Senate Committee, instilled a bias against male students accused of violating its policies, as the training materials identifies males as the perpetrators in all but one of the "case studies" provided and in certain instances identifies gender violence victims as female." *Id.* at ¶ 122.

- "The training materials, combined with the pressure to eradicate gender-based violence on campus create a bias against male students facing charges relating to sexual misconduct." *Id.* at ¶ 123.

- "The denial of due process and gender bias that existed throughout the investigation and enforcement of the discipline against Plaintiff resulted in an erroneous outcome that was based on flawed facts, logic and credibility determinations by Defendant." *Id.* at ¶ 124.

- "Upon information and belief male students in sexual misconduct cases at the University are discriminated against on the basis of their sex. Male students are presumed guilty, forced to meet a burden of proof that is inconsistent with the University's polices, and credibility determinations are made against male students. In situations where both students have consumed alcohol, the male student is presumed to have engaged in sexual

misconduct regardless of whether the female student has consented or initiated the sexual conduct." *Id.* at ¶ 125.

These vague, conclusory, and general allegations are insufficient to state a claim as a matter of law.

### A. Plaintiff Does Not Allege Facts Demonstrating Gender Bias in his Particular Case.

To survive a motion to dismiss, Plaintiff cannot rely on "generalized allegations" of gender bias alone, "but must combine them with *facts particular to his case*." *Columbia Coll. Chi.*, 933 F.3d at 855 (emphasis added). Plaintiff's vague allegations that he "was wrongfully subjected to a University disciplinary process marred by procedural flaws and sexual bias against males" and, similarly, that the outcome of his proceeding was "based on flawed facts, logic and credibility determinations" are plainly insufficient to assert gender bias.

Notably, the Seventh Circuit has clearly ruled that an argument asserting that a decision was wrong, or "against the weight of the evidence . . . does not imply that the Board's decision was based on [respondent's] gender." *Id*. at 856. This is particularly true where documents from the disciplinary proceedings "do not imply that [decision maker] blindly accepted [female complainant's] allegations while finding [the male respondent] incredible. Rather, after considering all of the evidence the hearing panel found some claims were substantiated and others were not," which does not support any gender-bias inference. *Id.* In other words, Plaintiff must allege more than disagreement with UIUC's judgment of the facts of his case. *See Doe v. Marian Univ.*, No. 19-cv-388-JPS, 2019 WL 7370404, at *9 (E.D. Wisc. Dec. 31, 2019) ("[m]erely demonstrating a discriminating outcome falls short of demonstrating a discriminatory intent"); *see also Doe. v. Univ. of S. Ind.,* 43 F. 4th 784, 792 (7th Cir. 2022) (emphasizing that "the federal district and appellate courts do not provide third and fourth forums—after the university

committee's hearing and the administrative appeal—to decide what actually happened between Jane and John" in a sexual encounter). He has not done so.

Plaintiff alleges no facts to suggest that the Subcommittee's findings of fact, credibility determinations, or finding of responsibility in his particular case were in any way influenced by gender bias. To the contrary, the Subcommittee's written decision and the Investigative Report it considered in reaching that decision clarify that Jane's account was not "blindly" accepted.  The Subcommittee carefully considered the information both Jane and Plaintiff provided in multiple interviews with the investigators and to the police, as well as other evidence including information provided by multiple witnesses identified by both parties. Specifically, the Subcommittee's decision letter clarifies that it considered the accounts of both parties on the central issue of whether Jane consented to sex without a condom and found Jane's accounts on that issue more credible than Plaintiff's accounts due to Plaintiff's admission that he provided false information and different accounts to several people and provided unconvincing explanations at the hearing itself for his inconsistent statements on that issue. Ex. 3 pp. 2-3; *see Columbia Coll. Chi.*, 933 F. 3d at 856 (in dismissing Title IX claim for lack of gender bias, noting that the male respondent "was provided with the opportunity to review the investigative materials; was given multiple opportunities to submit evidence; presented affidavits signed by witnesses; and submitted questions to be asked of [the female complainant] on cross-examination"). Indeed, courts following *Purdue I* and *Columbia College* have found no gender bias in situations where, among other things and as in this case: (1) both parties are similarly informed and have same access to evidentiary material; (2) there is no evidence that the female complainant's account was "baselessly credited without an interview from her;" (3) there is a lack of evidence of investigator hostility toward a male respondent; (4) the hearing documents reveal the panel analyzed the

credibility of both the female complainant and male respondent and explain why it ultimately found the male respondent less credible. *See Marian Univ.*, 2019 WL 7370404 *10. These factors reveal the absence of gender bias here.

Conversely, this case is completely unlike those in which gender bias is found to stem from decision makers discrediting all male witnesses and believing all female witnesses or conveying gender-based stereotypes. *Columbia Coll. Chi.*, 933 F. 3d at 855; *see also Doe v. Purdue Univ.*, No. 4:19-cv-56-TLS-JPK, 2020 WL 2839177 (N.D. Ind. June 1, 2020) ("*Purdue II*"); *Ludlow v. Nw Univ.*, 125 F. Supp. 3d 783, 792-93 (N.D. Ill. 2015). The Subcommittee is not alleged to have made any gender-specific comments or to have denied Plaintiff access to the evidence or the ability to present his case, and the decision letter indicates that the panel did not "blindly accept[] Roe's version of the facts." *Marian Univ.*, 2019 WL 7370404 *10; Ex. 3.

## B.  Plaintiff's Generalized Allegations Are Insufficient

In addition to lacking any allegations of gender bias in the outcome of Plaintiff's own case, the Complaint also lacks allegations of any pressure on UIUC's personnel engaged in administering student misconduct claims that could support a general inference of motivation to find male students responsible for sexual misconduct. Courts considering such external pressure issues and finding male-bias inferences have focused on lawsuits and public concerns raised about other claims against male students and the extent to which personnel addressing a charge against an individual male student might be influenced by such pressure. *Purdue II*, 2020 WL 2839177, at *13 (noting potential motivation "to discriminate against male students on the basis of gender" because of "immense pressure" from lawsuits and negative media regarding school's "handling of allegations of sexual assault perpetrated by male students"). Other decisions on this issue infer gender bias from government investigations of student misconduct processes at the time of the

case in question, which did not happen here. *Compare Purdue I*, 928 F.3d at 668 (concurrent OCR

investigations at the time of plaintiff's internal proceedings) with *Columbia Coll. Chi.*, 933 F.3d

at 855 (finding absence of gender-bias inference from combination of Dear Colleague Letter,

showing "Hunting Ground" movie on campus, and university's sponsored social media

educational posts that included "Teach boys that they are not entitled to women's bodies" and

"Misogyny kills: the sexual entitlement that many men have and the ways in which they objectify

women are behind the high rates of sexual violence, abuse, and harassment that women

experience.")

There are no such allegations here. Plaintiff alleges, first, pressure from the Department of

Education's Office for Civil Rights' 2011 Dear Colleague Letter, ("2011 DCL") – another example

of an allegation he has cut pasted from other complaints that is inapplicable to his own case. *See*

Compl. ¶¶ 99-100; *Doe I*, Dkt. 1 at ¶¶ 130, 133 (Mar. 6, 2019); *Doe II*, Dkt. 8 at ¶¶ 7, 154, 157

(Aug. 23, 2017). The 2011 DCL is irrelevant here because it was rescinded in 2017 – well before

Plaintiff's proceeding in 2020. Courts have specifically considered and rejected the argument that

2011 DCL created any inference of gender bias *after it had been rescinded. See Doe v. Loyola

Univ. Chi.*, No. CV 7293, 2021 WL 2550063, at *7 (N.D. Ill. June 22, 2021) (finding that

universities "faced no threat of federal investigation or loss of federal funds in 2020 for failing to

adhere to the rescinded 2011 letter" and "had no obligation to adopt new policies in light of" the

Q&A guidance issued by the DOE in 2017).[7]

---

[7] Indeed, courts that considered claims that arose *when the 2011 DCL was in effect* specifically rejected the argument
that efforts by universities to comply with the standards set forth in the 2011 DCL created an inference of gender bias,
finding that the DCL "applies equally to male and female students accused of sexual assault" and that universities
have legitimate interests in "complying with the Department of Education's instructions and ensuring that [the
university] protects victims of sexual assault." *Columbia Coll. Chi.*, 933 F.3d at 855; *Doe v. Columbia Coll. Chi.*, 299
F. Supp. 3d 939, 956 (N.D. Ill. 2017).

Second, Plaintiff alleges that UIUC's Title IX training materials promote bias against men because they allegedly identify men as perpetrators in "all but one" of the case studies and identify victims as women "in certain instances." Comp. ¶ 122. Plaintiff does not plead, however, any connection between such materials and alleged gender-based pressure for the personnel who decided his particular case. Moreover, this allegation undermines itself in admitting that case studies included examples where both men and women were victims of sexual assault. *Id.*

Third, Plaintiff alleges that a three-year-old opinion piece in the student newspaper, the presence of victim's rights advocacy groups on campus, and the fact that UIUC recognizes Sexual Assault Awareness Month demonstrate a concern by UIUC about "rape culture." Compl. ¶ 100. Yet, an allegation that members of the campus community were concerned about sexual violence does not create an inference of gender bias against men. *See e.g. Columbia Coll. Chi.*, 299 F. Supp. 3d at 956 (explaining that plaintiff's allegations attempting to create an inference of gender bias instead reflected the university's legitimate interest in protecting victims of sexual assault.).

Ultimately, because Plaintiff fails to plead any specific facts which bring forth an inference that UIUC discriminated against him because of his sex, he fails to state a Title IX claim for which relief can be granted. Count II must be dismissed.

Furthermore, Plaintiff seeks damages for emotional distress that are simply not available as a matter of law. In *Cummings v. Premier Rehab Keller*, the Supreme Court held that emotional distress damages are not available under Spending Clause antidiscrimination statutes, including Title IX. 142 S. Ct. 1562, 1576 (2022). Therefore, Plaintiff's claim for emotional distress damages under Title IX must be dismissed.

**IV.      Plaintiff's Breach of Contract Claim (Count III) Must be Dismissed.**

To state a breach of contract claim, Plaintiff must allege: (1) the existence of a valid and enforceable contract; (2) his performance of the contract; (3) breach by UIUC; and (4) a resulting injury. *See Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001). The only potential contract terms here stem from Plaintiff's allegations regarding the following procedures:

- The Code, Policy, and Student Disciplinary procedures "provide that students will not be dismissed from the University without following its specified procedures;"

- The Policy "further provided that students' due process rights would not be denied or diminished;"

- UIUC "deprived Plaintiff of the opportunity to have any kind of meaningful hearing;"

- Instead, UIUC "selected two investigators to investigate the allegations and to collect evidence. The investigators interviewed Plaintiff … and permitted him to provide additional explanations, questions, and evidence in writing."

- UIUC "deprived Plaintiff of the procedural safeguards that have repeatedly been judicially required to be present in such a hearing, including the right to be heard, the right to present evidence and witnesses, confront one's accuser and challenge adverse witnesses through cross-examination, all before an impartial and objective factfinder."  Compl. ¶ 129.

Any breach of contract claim based upon these cited procedures must fail because Plaintiff has not identified any specific and definite contractual promise by UIUC about its process that UIUC breached, as Illinois law requires. *Abrams v. Ill. Coll. of Podiatric Med.*, 395 N.E.2d 1061, 1065 (Ill. App. Ct. 1979). To the contrary, Plaintiff's allegations demonstrate the opposite – that UIUC followed its procedures with regard to the resolution of Jane's complaint.

In addition, Plaintiff's breach of contract claim is fatally defective because Plaintiff does not allege any facts to suggest that UIUC's decision to dismiss Plaintiff was made "arbitrarily, capriciously, and in bad faith" as required under Illinois law. *See Doe v. Loyola*, No. 1:18-cv-07335, 2022 WL 4535090, at *36-37 (Sept. 28, 2022); *Frederick v. Nw. Univ. Dental Sch.*, 617 N.E. 2d 382, 387 (Ill. App. Ct. 1993); *DiPerna v. Chi. Sch. of Prof'l Psychology*, 893 F.3d 1001,

1007 (7th Cir. 2018). Courts have adopted the deferential arbitrary and capricious standard because they are reluctant to interfere with regulation of student conduct. *Loyola*, 2022 WL 4535090, at *36-37; *DiPerna*, 893 F.3d at 1007. Thus, to warrant judicial review, a university's decision must be "without any discernable rational basis," to such an extreme that the university arguably "did not actually exercise professional judgment." *Loyola*, 2022 WL 4535090, at *37; *DiPerna*, 893 F.3d at 1007; *Doe v. Univ. of Chi.*, No. 16 C 08298, 2017 WL 4163960, at *8 (N.D. Ill. Sept. 20, 2017) ("[A]part from anything else, the University is entitled to exercise discretion in the discipline of its students without being second-guessed by federal courts, so long as its exercise of discretion is not "clearly" unreasonable."). "In sum, to bring a breach of contract claim under Illinois law, Doe must show that [UIUC] acted arbitrarily, capriciously, or in bad faith." *Loyola*, 2022 WL 4535090, at *37.

Analyzed against this standard, Plaintiff's breach of contract claim is wholly insufficient. The Subcommittee report explained the rationale basis for its decision, primarily Plaintiff's deceit and inconsistent statements, as referenced directly in Plaintiff's Complaint. *See* Compl. ¶¶ 10-11, 13. In the end, Plaintiff's claim expresses disagreement with that rationale, but that offers no basis for this Court to review UIUC's decisions, which require only a "rational basis." The Complaint provides no basis under established Illinois law for this Court to review UIUC's decisions in this matter, and Plaintiff's breach of contract claim must be dismissed.

## V.    Plaintiff's Claim for Declaratory Judgment (Count IV) Must Also Be Dismissed.

Plaintiff's stand-alone claim for declaratory judgment should be dismissed both because all of his underlying claims in Counts I-III must be dismissed and because, in any event, declaratory judgment is merely a type of relief, not an independent claim. The Declaratory Judgment Act, 28 U.S.C. § 2201, which Plaintiff cites in the Complaint (¶ 206), does not provide

an independent cause of action. *Garrard v. Rust-Oleum Corp.*, 575 F. Supp. 3d 995, 1004 (N.D. Ill. 2021) (a "claim for a declaratory judgment is not a cognizable independent cause of action") (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993)); *Sieving v. Cont'l Cas. Co.*, 535 F. Supp. 3d 762, 774 (N.D. Ill. 2021) ("requests for declaratory judgment… are not independent causes of action") (quoting *Elward v. Electrolux Home Prods., Inc.*, 214 F. Supp. 3d 701, 708 (N.D. Ill. 2016)). Because Counts I through III fail as a matter of law and declaratory relief is not an independent action, Count IV must also be dismissed.

## CONCLUSION

For the reasons set forth above, Defendant Board of Trustees of the University of Illinois respectfully request that this Court dismiss Plaintiff's Complaint in its entirety.

Dated: December 6, 2022

Respectfully submitted,

Defendant Board of Trustees of the University of Illinois,

By:   /s/ Peter G. Land
          One of their Attorneys

Peter G. Land (Lead Counsel) #6229659
Gwendolyn B. Morales #6297233
Husch Blackwell LLP
120 S. Riverside Plaza, Suite 2200
Chicago, Illinois 60606
(312) 655-1500
Peter.Land@huschblackwell.com
Gwendolyn.Morales@huschblackwell.com