# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-2197 |
| | ) | |
| DONALD J. EDWARDS, in his official | ) | |
| capacity as Chair of the University of | ) | |
| Illinois Board of Trustees; RAMÓN | ) | |
| CEPEDA, TAMI CRAIG SCHILLING, | ) | |
| JOSEPH GUTMAN, PATRICIA BROWN | ) | |
| HOLMES, WILBUR C. MILLHOUSE III, | ) | |
| SARAH C. PHALEN, SANCHITA | ) | |
| TEEKA, MOHAMMAD A. HAQ, and | ) | |
| KYLE INGRAM, in their official | ) | |
| capacities as Members of the University | ) | |
| of Illinois Board of Trustees; and JAY | ) | |
| ROBERT "J.B." PRITZKER, GOVERNOR | ) | |
| OF ILLINOIS, in his official capacity as a | ) | |
| Member *ex officio* of the University of | ) | |
| Illinois Board of Trustees, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER & OPINION</u>

This matter is before the Court on certain defendants' Motion to Dismiss (doc. 32). Defendants Donald Edwards, Ramón Cepeda, Tami Craig Schilling, Joseph Gutman, Patricia Brown Holmes, Wilbur C. Millhouse III, Sarah C. Phalen, Sanchita Teeka, Mohammad A. Haq, and Kyle Ingram (hereinafter referred to collectively as "Defendants" or "Board Members") were served with Plaintiff John Doe's Amended Complaint (doc. 20) and filed the instant Motion (doc. 32) and a Memorandum supporting it (doc. 36). Defendant Jay Robert "J.B." Pritzker has not been served and

does not join in the Motion to Dismiss. Plaintiff filed a Response (doc. 35) to the Motion to Dismiss. Defendants did not file a reply. Plaintiff also requests a preliminary injunction. (Doc. 20 at 30). The matter is ripe for ruling, and for the foregoing reasons, all of Plaintiff's claims against Defendants are now dismissed with prejudice for failure to state a claim, with all claims against Defendant Pritzker dismissed without prejudice for insufficient service of process. Plaintiff's request for preliminary injunction is denied.

BACKGROUND

It is axiomatic under federal rules of procedure—and yet particularly important to note when ruling on a suit adjacent to sensitive allegations of misconduct—that at this stage the Court must take as true all facts properly pleaded in the complaint in the service of determining whether Plaintiff's cause of action may go forward. *See, e.g.*, *United States v. Molina Healthcare of Ill., Inc.*, 17 F.4th 732, 738 (7th Cir. 2021). Therefore, this statement of facts will narrate events as set forth by Plaintiff in his Amended Complaint. It should not be interpreted as the Court's finding as to what happened between John Doe and Jane Roe, or as an opinion on either's credibility.

Plaintiff matriculated at the University of Illinois at Urbana-Champaign ("the University") in 2018.[1] As an incoming student, he received a number of documents

---

[1] The Amended Complaint states that Plaintiff "was accepted to the University's class of 2018." (Doc. 20 at 14). Although the phrase "class of," followed by a year, typically denotes a student's expected or actual year of graduation, it appears from the timeline presented in the Complaint that Plaintiff means he began his studies at the University in 2018.

from the University, including the Student Code, Student Disciplinary Procedures, and an appendix to the Student Disciplinary Procedures entitled "Student Conduct Protocol for Allegations of Sexual Misconduct, Including Sexual Harassment, Sexual Assault, Sexual Exploitation, Stalking, Dating Violence, and Domestic Violence" (hereinafter "Appendix D"), which describes the manner in which the University investigates and adjudicates accusations of sexual misconduct and enumerates various rights of complainants and accused students. (Doc. 20 at 2).

On February 14, 2020, Plaintiff and another University student, Jane Roe, drank together at an off-campus bar. (Doc. 20 at 7). Afterwards, they both went to Plaintiff's apartment, where they got in bed and began to kiss. (Doc. 20 at 7). Roe asked Plaintiff if he had a condom; when he replied that he did not, she told him she was not comfortable with having unprotected sex yet agreed to do so anyway, telling Plaintiff to "be careful." (Doc. 20 at 7–8). The two engaged in sexual intercourse; Plaintiff then asked Roe to perform oral sex on him, and she did so. (Doc. 20 at 8). Plaintiff believed that Roe had verbally or non-verbally consented to each sexual act. (Doc. 20 at 8).

Upon leaving Plaintiff's apartment, Roe reported the incident to law enforcement and sought medical assistance. (Doc. 20 at 8). On February 27, 2020, Plaintiff was informed by University authorities that a sexual-assault allegation had been made against him. (Doc. 20 at 2–3).

The University conducted an investigation into Roe's allegation, and Plaintiff agreed to sit for an interview with a University investigator. (Doc. 20 at 3). The

investigator also interviewed third-party witnesses and obtained evidence (including electronic messages and medical records) from law enforcement. (Doc. 20 at 3). Plaintiff and Roe were both given opportunities to review the evidence and submit comments. (Doc. 20 at 3). Plaintiff was invited to provide questions that the investigators could choose to ask Roe, and Roe was likewise allowed to suggest questions to be posed to Plaintiff. (Doc. 20 at 3).

In August of 2020, following the conclusion of this investigation, a panel made up of three members of the University's Subcommittee on Sexual Misconduct ("Subcommittee") held a hearing to consider the charges against Plaintiff. (Doc. 20 at 3, 13). The Subcommittee was provided with a final report (attached here as an exhibit to Defendants' Memorandum in support of their Motion to Dismiss (doc. 33-3)) summarizing the investigators' findings. (Doc. 20 at 3). Plaintiff attended the hearing, but Roe did not. (Doc. 20 at 4). The hearing went forward in her absence, and the panel heard from other witnesses. (Doc. 20 at 3). Plaintiff did not have the opportunity to cross-examine those witnesses. (Doc. 20 at 3). Members of the panel questioned Plaintiff; however, because Roe was not present, they did not ask him any questions provided by Roe, nor were they able to ask Roe any questions Doe might have furnished. (Doc. 20 at 3–4). The panel deliberated and found, by preponderance of the evidence, that Plaintiff had violated the Student Code by engaging in sexual intercourse with Roe without her consent. (Doc. 20 at 4).

Plaintiff was dismissed from the University and advised that he would be allowed to petition for readmission after two years if he met two conditions:

employment and/or completion of academic coursework at another institution of higher learning, and submission of a 3,000-word research paper on the issue of consent in sexual relations. (Doc. 20 at 4). He was also prohibited from contacting Roe or entering University property for the next two years. (Doc. 20 at 4). Plaintiff appealed to the Senate Committee on Student Discipline, which reviewed the record and affirmed the Subcommittee panel's decision. (Doc. 20 at 4). Plaintiff was removed from the University and banned from campus as of September 18, 2020. (Doc. 20 at 5). His dismissal was noted on his University transcript, and he was informed that the University would maintain a record of it indefinitely. (Doc. 20 at 5).

Nearly two years later, Plaintiff filed suit against the University's Board of Trustees in this Court, alleging violation of his due-process rights under the Fourteenth Amendment, violation of Title IX, and breach of contract. (Doc. 1). He sought monetary, injunctive, and declaratory relief and requested a preliminary injunction. (Doc. 1). This Court dismissed Counts I (due process), II (Title IX), and III (breach of contract) without prejudice and his remaining claims with prejudice, and it denied him a preliminary injunction. (Doc. 19 at 13). It found his due-process claim was brought against improper defendants (the Board of Trustees being immune from suit under the Eleventh Amendment) and that he failed to state a claim of sex bias under Title IX. (Doc. 19 at 5, 9). Plaintiff filed an Amended Complaint naming as Defendants the Board Members in their official capacities. (Doc. 20). It contains only two counts (§ 1983 (due process) and Title IX) and seeks only an injunction (including a preliminary injunction) restoring Plaintiff to his status at the University and

5

granting him a new hearing,[2] a declaratory judgment finding the University's sexual-misconduct disciplinary procedures unconstitutional, and payment of his attorney fees and costs of suit. (Doc. 20 at 1, 6, 17, 28).

## LEGAL STANDARD

To survive a 12(b)(6) motion for failure to state a claim, the plaintiff must "state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual

---

[2] One paragraph in the Amended Complaint reads in part, "This is an action for declaratory and injunctive relief and for damages arising out of the decision of The Board (sued individually in their official capacities) to separate Plaintiff, John Doe, from the University of Illinois at Urbana-Champaign." (Doc. 20 at 1). However, monetary damages are not referenced anywhere else in the Amended Complaint, which cites *Ex parte Young* to establish that its new set of defendants does not enjoy immunity under the Eleventh Amendment "because John is seeking only injunctive relief." (Doc. 20 at 6). (That passage also refers to Plaintiff's suit as one against the Board Members in their *individual* capacities; however, the Court will assume this label was an error, because the caption and other sections of the Amended Complaint identify the Defendants as sued in their *official* capacities, and because *Ex parte Young* specifically addressed the question of whether suing an office-holder in his official capacity to enjoin him from enforcing an allegedly unconstitutional law was permissible in light of the Eleventh Amendment. 209 U.S. 123, 159 (1908); *see also Ameritech Corp. v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002).) In a section enumerating Plaintiff's desired relief at the end of the Amended Complaint, he requests a "preliminary and subsequent permanent injunction fully reinstating" him as a student at the University, expungement of mentions of the charges against him and their adjudication from his student record or transcript, a declaration that Defendants' sexual-misconduct procedures are "unconstitutional as applied," fees and costs, and "such other and further relief that this Court deems just." (Doc. 20 at 30). Once again, he does not mention monetary damages. Finally, Plaintiff reiterates in his Response that he seeks only injunctive and declaratory relief. (Doc. 35 at 4–5). Thus, noting that it agrees with Defendants that compensatory damages or other retrospective relief would be barred on Count I under *Ex parte Young*, (doc. 36 at 9), the Court assumes that the sole reference to "damages" on the first page of the Amended Complaint is an error and that Plaintiff has abandoned his prayer for relief of that type.

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Courts will "accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-moving party." *Molina Healthcare of Ill., Inc.*, 17 F.4th at 738. The complaint only needs enough facts "to present a story that holds together." *Twombly*, 500 U.S. at 545. However, legal conclusions are not accepted as true. A claim cannot survive if it merely recites the elements of the cause of action, *id.* at 555, and courts "may reject sheer speculation, bald assertions, and unsupported conclusory statements," *Taha. v. Int'l Bhd. Of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020). Finally, while plausible does not mean probable, there must be "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

### DISCUSSION

As an initial matter, the Court *sua sponte* dismisses this action as to Defendant Pritzker because he was not timely served, nor is there any record before the Court that he waived service of process. *See* Fed. R. Civ. P. 4(m).

### I.  **Count I: Due Process**

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount." *The Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570–71 (1972). In the instant case, the University—a public institution acting under color of state law under 42 U.S.C. § 1983, the parties agree—informed Plaintiff of the

7

charges against him and held a hearing before disciplining him. Thus, to survive the Board Members' Motion to dismiss his due-process count, Plaintiff must allege facts showing that this punishment deprived him of either a property right or a liberty interest, and that the pre-deprivation hearing he was given was constitutionally insufficient, not meaningfully providing him notice and an opportunity to be heard. *See Bell v. Burson*, 402 U.S. 535, 541–42 (1971).

With respect to student disciplinary actions, the relevant property right is the plaintiff's interest in continuing his or her education at the defendant school:

> [A]ttending a university does not automatically create a constitutional property right. Our cases establish that students do not have a stand-alone property interest in their continued education at state universities. . . . This is because, unlike with grade schools, the law does not entitle each person to an education at a public university.

*Malhotra v. Univ. of Ill. at Urbana-Champaign*, 77 F.4th 532, 537 (7th Cir. 2023) (citations omitted). In support of his argument that the proceeding against him implicated one of his property rights, Plaintiff states that "[t]he Code, Policy, Appendix D, and the Student Disciplinary Procedures afforded . . . a property right in continuing education, his degree and diploma" and that "[a]n agreement and implied contract was formed between Plaintiff and Defendant [sic] to not dismiss Plaintiff from the University without Due Process." (Doc. 20 at 17). These are conclusory statements and may not be given credence at this stage. What matters is the factual narrative offered.

Plaintiff attaches to his Amended Complaint excerpts of two documents: the Student Code and Appendix D. (Doc. 20 at 32–48). He alleges he was provided with these documents before enrolling at the University and reviewed them "in whole or

in part," both at that time and after matriculating. (Doc. 20 at 15). He highlights representations by the University that students have at least the same rights as other citizens, that students may retain rights other than those enumerated in the Student Code and related procedures, that "the University discipline system shall be separate from, but coexistent with general systems established by society," and that "[t]he community supports each member's right to study." (Doc. 20 at 15–16).

"[A]ny property interest is a matter of contract between the student and the university." *Doe v. Purdue*, 928 F.3d 652, 660 (7th Cir. 2019). But it is not enough for Plaintiff to merely gesture in the direction of University documents and designate them as a contract by virtue of which he possesses an entitlement to continued education. This is a legal conclusion, not a factual one. Rather, a student in his position must point to the "exact promises the university made to the student, and the promises the student made in return." *Id.* (quoting *Charleston v. Bd. of Trs. Of Univ. of Ill. at Chi.*, 741 F.3d 769, 772 (7th Cir. 2013).

Plaintiff describes the contractual relationship as one in which, in exchange for Plaintiff's payment of tuition, the University has promised to employ due process before dismissing him, and he offers the excerpts summarized above as those "exact promises." They are far from exact. There is nothing in the documents before the Court setting forth Plaintiff's obligation to pay tuition, nor supporting a conclusion that his timely tuition payments constitute consideration for certain acts of the University. This circuit has considered this issue before and found that mere delineation of rights and procedures in a college or university student handbook is

9

not tantamount to the sort of implied contract Plaintiff wants this Court to infer. *See, e.g., Purdue*, 928 F.3d at 660. In *Williams v. Wendler*, the court advanced the following hypothetical as an example of how a property right in continued higher education might be manifested:

> Suppose a student had a contract with the college in which he promised to pay tuition, in an amount specified by the college, on the first day of each quarter, and in exchange the college promised not to suspend him unless he hazed another student. The contract would create an entitlement.

503 F.3d 584, 589 (7th Cir. 2008). There is nothing like that degree of specificity and clarity of exchange in the University documents Plaintiff offers here.

Plaintiff cites *Doe v. Board of Trustees of the University of Illinois*, No. 17-cv-2180, WL 11593303, *4 (C.D. Ill. Dec. 18, 2017), to argue that whether the various student handbooks, policies, and procedures of a university constitute a contract requiring constitutional due process in a student discipline matter is a question that should be reserved for the summary-judgment stage. (Doc. 35 at 6). Yet *Malhotra* and *Purdue* were both at the motion-to-dismiss stage when the Court of Appeals held, on similar facts, that their respective plaintiffs did not plead an adequate property interest. This Court similarly finds that Plaintiff's well-pleaded allegations fail to establish he had entered into a contract with the University that would support such a property right.

In the alternative, Plaintiff claims the University deprived him of a liberty interest when it adjudicated him responsible for sexual misconduct, forced him to leave the University, and maintained evidence of his dismissal as part of his official transcript. (Doc. 20 at 6). As a result, "Plaintiff will be forced to explain, for the

remainder of his professional life, why he was dismissed from The University." (Doc. 20 at 6).

To allege that a liberty interest was implicated in the disciplinary action against him, Plaintiff must not only claim that the University's actions damaged his reputation, but that it altered his "legal status" through "deprivation of a right previously held." *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 617 (7th Cir. 2002) (citing *Paul v. Davis*, 424 U.S. 693, 708–09 (1976)). This has become known as the "stigma plus" test for the presence of a liberty interest on which a state actor may have infringed. *See Colaizzi v. Walker*, 542 F.2d 969, 973 (7th Cir. 1976).

The reputational damage (the "stigma" affecting the plaintiff) must be severe. In the context at hand, the injury to the plaintiff's reputation must make it "virtually impossible for him to seek employment in his field of choice." *Purdue*, 928 F.3d at 661; *see also Doyle*, 305 F.3d at 617. It may not be merely speculative or depend upon the plaintiff's own voluntary disclosure of the charges against him or the disciplinary consequences he suffered. In *Olivieri v. Rodriguez*, 122 F.3d 406, 408–09 (7th Cir. 1997), the district court was found to have appropriately granted summary judgment to the defendant police superintendent when the plaintiff police officer, who was fired for cause, could not show the defendant had disclosed this information to anyone or that the plaintiff would be required to disclose it to any prospective employers. By contrast, in *Doyle,* the plaintiff child-care workers sufficiently alleged a liberty interest in not being indicated for child abuse or neglect when the state agency making the determination had already reported it to a statewide registry, and most

11

child-care providers check the registry and are essentially prohibited from hiring individuals whose names appear on it. 305 F.3d at 617.

Plaintiff's argument that the University has deprived him of a liberty interest thus relies on a great many assumptions: for example, that virtually every potential employer will ask for a transcript from every college he has attended, that other universities will not admit him because of his disciplinary record at the University, that he will not be able to obtain satisfactory employment without a college degree or without furnishing his University transcript, that no employer in a field of interest to him will hire him after having learned of his dismissal from the University on sexual-misconduct charges, and that his adjudication will forever hamper his professional pursuits. In a time when college degrees are required for a significant (albeit shrinking) share of positions in the job market,[3] and when tolerance for sexual misconduct is perhaps lower than it historically has been, the concern Plaintiff expresses for his future may have the ring of truth—appearing, as Plaintiff puts it, to be an unassailable "fact of our modern world." (Doc. 35 at 7). Yet, without more, it does not suffice to state a due-process claim under the precedents binding this Court.

---

[3] *See* Joseph B. Fuller, et al., *The Emerging Degree Reset* (2022), https://www.burning glassinstitute.org/research/the-emerging-degree-reset (last visited May 1, 2024); Steve Lohr, *A 4-Year Degree Isn't Quite the Job Requirement It Used to Be*, N.Y. Times, Apr. 8, 2022, https://www.nytimes.com/2022/04/08/business/hiring-without-college-degree.html (last visited May 1, 2024) (reporting that the percentage of online job listings in the United States requirement at least a four-year college degree declined from fifty-one percent in 2017 to forty-four percent in 2021, with most of the affected positions remaining reclassified as the economy has recovered from the COVID-19 pandemic).

Plaintiff copiously cites *Doe v. Purdue University*, a 2019 opinion of the Seventh Circuit Court of Appeals dealing with a scenario that is superficially similar to the facts of the instant case but features crucial distinctions. 928 F.3d 652 (7th Cir. 2019). In *Purdue*, the plaintiff attended the defendant university on a Navy Reserve Officer Training Corps ("ROTC") scholarship and planned to join the United States Navy, presumably as a commissioned officer, upon graduation. *Id.* at 661. After Purdue found him responsible for the sexual assault of a fellow student and sanctioned him with a one-year suspension, the plaintiff was stripped of his scholarship, permanently banned from the Navy ROTC, and likely prevented from ever enlisting in the Navy, certainly at the level at which he had hoped to serve. *Id.* at 661–62. The Court of Appeals found that Purdue had deprived him of a liberty interest. *Id.* at 663.

Plaintiff argues this Court is bound to reach the same conclusion in this case— the more so because his suspension was of greater duration than that of the plaintiff in *Purdue*. (Doc. 20 at 21). However, the liberty-interest finding in *Purdue* was based on the certainty and specificity of what the accused student lost when the university adjudicated him guilty of sexual misconduct. By the time the plaintiff filed suit, the Navy ROTC had already taken damaging (and likely irreversible) actions against him on the basis of Purdue's disciplinary findings, and his professional plans, which would have required him to successfully complete both his undergraduate degree and the Navy ROTC program, had been derailed. *Id.* at 661. Thus, the Court of Appeals found his deprivation was not merely speculative and he had satisfied the "stigma plus" test. *Id.* at 662–63.

13

Here, by contrast, Plaintiff offers no indication that any school or employer has rejected him on the basis of the University's disposition of the charges against him, nor that they are likely to do so, except by way of vague and conclusory statements, such as that he "has had to offer explanations for his dismissal from The University" and that "Defendant's [sic] actions permanently damaged Plaintiff's good name and reputation." (Doc. 20 at 6). He does not allege, for example, that any statute, administrative rule, or professional standard bars him from attending another institution or obtaining work in a chosen field, as with the child-care providers in *Doyle*. 305 F.3d at 617. His Amended Complaint does not even provide any insight into what his chosen profession might be and thus cannot plausibly allege that Defendants' actions have prevented or probably will prevent him from pursuing it. In fact, Plaintiff's disciplinary period has now lapsed, and he is free to reapply for admission to the University, yet he does not allege that he tried to do so and was rejected, that he has been unable to meet the conditions for readmission, or indeed that the University continues to limit his life prospects in any tangible way.

Even where a plaintiff has identified a chosen career path that could be affected by a university's disciplinary determination, this circuit has found speculation as to future outcomes insufficient. Ruling after *Purdue*, the Court of Appeals found a student suspended for one year from a public university did not identify a liberty interest the school had impaired when he alleged that his punishment would "invariably" be disclosed to future employers and "may" affect his prospects as a healthcare consultant. *Malhotra*, 77 F.4th at 538. Malhotra, unlike

Plaintiff here, did not have to reapply for admission to the university after his suspension, and so his eventual completion of a degree was perhaps more certain. *Id.* However, like Plaintiff, he "has not alleged that he applied to these schools or jobs yet none would take him." *Id.* For that reason, the court contrasted his situation with that of the plaintiff in *Purdue*, who had already suffered consequences in connection with his expulsion, and the child-care workers in *Doyle*, who were foreclosed from remaining in an entire profession. The liberty-interest finding in *Malhotra* hinged on lack of certainty, not the difference in severity of the punishment vis-à-vis *Purdue* or the nature of the charges. *Id.*

Plaintiff has not alleged facts that would support a finding that he has a property right or liberty interest that the University could have violated, even if the procedures it used to adjudicate him responsible for sexual assault were insufficient, and so it is unnecessary for the Court to consider those procedures further. However, Plaintiff's allegations that he was denied due process are also lacking, as the Court will discuss briefly.

Courts have found that students have rights under the Due Process Clause but that the Constitution does not guarantee them disciplinary processes identical or comparable to a formal court proceeding. *See Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 677 (7th Cir. 2016) ("Due process does not . . . require a judicial or quasi-judicial trial . . before a school may punish misconduct" (quoting *Coronado v. Valleyview Public Sch. Dist. 365-U*, 537 F.3d 791, 795 (7th Cir. 2008).). What due process means in educational settings is highly dependent on context. *See Bd. of*

*Curators of Univ. of Mo. V. Horowitz*, 435 U.S. 78, 86 (1978). As Plaintiff correctly points out, courts typically require more formal procedures when the school is a university rather than a primary or secondary school, when the reason for the student's potential suspension or expulsion is disciplinary rather than academic, and when the punishment the student faces is more severe. *See Purdue*, 928 F.3d at 663; *Goss v. Lopez*, 419 U.S. 565, 575–76 (1975).

Still, foundational elements of due process recur. "[N]otice of the charges against [the student], . . . an explanation of the evidence the authorities have and an opportunity to present his side of the story"—the basic requirements the Supreme Court laid out in *Goss*, a case involving the suspension of high-school students—are also commonly applied to higher-education settings and higher-stakes proceedings. *See, e.g.*, *Pugel v. Bd. of Trs. of the Univ. of Ill.*, 378 F.3d 659, 662–63 (7th Cir. 2004) (finding "the hallmarks of procedural due process are notice and an opportunity to be heard" and that plaintiff, a student dismissed from a graduate program after being found guilty of fabricating data, was afforded due process when she received both, despite the presence of slight procedural errors and insufficiencies). If a student receives both notice and a hearing, he or she "must show that the university's actions were so wholly arbitrary as to 'shock[ ] the conscience' " in order to demonstrate that the hearing was not, in fact, a genuine opportunity to be heard. *Hess*, 839 F.3d at 677 (quoting *Remer v. Burlington Area Sch. Dist.*, 286 F.3d 1007, 1010 (7th Cir. 2002)). The bar for showing that a purported hearing was a sham is high: "With respect to educational suspensions and expulsions, all the Constitution requires is 'some kind

of hearing.' . . . Notice and an opportunity for informal comment suffice." *Doe v. The Trs. of Ind. Univ.*, No. 22-1576, 2024 WL 1824967, at *4 (7th Cir. Apr. 26, 2024) (quoting *Goss*, 419 U.S. at 579).

In *Purdue*, the Court of Appeals found the defendant university's process may have fallen short of constitutional norms because the plaintiff alleged that Purdue did not disclose its evidence to him and that two of the adjudicators admitted to not even having read the investigative report. *Purdue*, 928 F.3d 652, 663–64. The first deficiency violated the *Goss* requirement of an explanation of the evidence against the student facing charges; the second was egregious enough to render the plaintiff's hearing a "sham or pretense." *Id.* (quoting *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d (7th Cir. 2016)). The court noted that "Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension." *Id.* at 663.

These are a far cry from Plaintiff's allegations here. He identifies two flaws in the proceeding against him: first, that he was not allowed to cross-examine Roe or any other adverse witness directly but could do so only through questions submitted to and posed by the Subcommittee, and second, that the hearing went forward— ultimately resulting in a finding adverse to the accused—without the participation of the accuser.[4]

---

[4] Plaintiff also alleges that he "was not afforded the opportunity to present his testimony or evidence to The Subcommittee or Senate Committee in a manner that would assist The Subcommittee in determining the creditability of either party." (Doc. 20 at 5). It is unclear whether this is a reference to his inability to cross-examine or otherwise confront his accuser, or if there are additional ways in which he contends he was barred from presenting evidence or testimony; if the latter; Plaintiff provides

While acknowledging that the Seventh Circuit has not found the right to confront one's accuser and the right to cross-examine adverse witnesses vital to due process in the higher-education context, Plaintiff points to cases he believes open the door to such a conclusion. (Doc. 20 at 24–27). First, he cites concerns raised in several Central District cases, including *Doe v. Board of Trustees of the University of Illinois*, No. 17-cv-2180, 2018 WL 11269804, at \*25 (C.D. Ill. July 24, 2018), about the constitutionality of a previous version of what is now Appendix D that did not allow an accused student to question witnesses by any means. Because the version of the procedures now at issue does allow limited cross-examination of complainants and other witnesses who appear at the hearing, the dictum in this opinion is unpersuasive here.

Plaintiff also directs the Court's attention to a Sixth Circuit case, *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018). His reliance on *Baum* is inapt—not only because it is non-precedential in this circuit, but because it, too, poses a completely different question from the instant case. In *Baum*, witnesses came forward on both sides to testify about the alleged assault, and the university's decision ultimately rested on the adjudicators' evaluation of those witnesses' credibility (as well as that of the accuser and accused), yet no cross-examination of the witnesses was permitted—even through attorneys, other agents, or questions posed by a neutral arbiter. *Id.* at 582. *Baum* does not address a situation where the accuser did not participate in the

---

no more specific allegations as to such failings. The Court finds this so vague as to constitute a legally conclusory statement and will not consider it.

18

hearing and where participating witnesses could be cross-examined by the panel using questions submitted by each party. Furthermore, the right to cross-examination the Sixth Circuit recognizes in school disciplinary proceedings is limited to scenarios where the outcome of the hearing can be reduced to "a problem of credibility" (as was the case in *Baum*). *Flaim v. Medical Coll. of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005) (quoting *Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir. 1972)). Plaintiff does not allege that the credibility of the other witnesses he could not personally cross-examine was directly at issue in his own hearing.

Unsupported by case law, Plaintiff proposes the University should "require the complainant, Jane Roe, to testify and allow Plaintiff to cross-examine her" (Doc. 20 at 6). But "[u]niversities do not have subpoena power," *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 405 (6th Cir. 2017), and so Plaintiff is arguing the University, by not forcing Roe to appear and testify against her will, violated due process by failing to offer him a procedural "right" it legally and physically could not guarantee him. This Court finds no case suggesting that due process in the higher-education context requires access to the subpoena power, and many finding that it does not. *See, e.g.*, *Doe v. Univ. of Miss.*, 361 F.Supp.3d 597, 613 (S.D. Miss. 2019) (finding plaintiff did not show defendant university violated his due-process rights by not allowing him to subpoena witnesses); *Williams v. Penn. St. Univ.*, No. 4:20-cv-00298, 2023 WL 6626789 (M.D. Pa. Oct. 11, 2023) ("Penn State cannot force a witness to participate in a hearing . . . This does not mean that Penn State could hide behind this lack of authority to sanction students based on third-party testimony alone. But in the absence of

19

evidence of a pattern or practice of doing so, Penn State's policies are not facially deficient."). Perhaps Plaintiff suggests that since Roe refused to participate in the hearing and the University lacked the means to compel her to do so, it was obligated to drop the charges against him—even though she had previously cooperated with the investigation culminating in the report the panel was furnished.[5] If so, he cites no support for that conclusion, and therefore the factual allegations he makes (that Roe did not testify at the hearing and could not be cross-examined, yet Defendants punished Plaintiff regardless) do not state a due-process claim.

Plaintiff has not adequately alleged that he had a property right to continue his education, that the University deprived him of a liberty interest, or that the procedures employed to find Plaintiff in violation of University rules and to dismiss him from the University were unconstitutional under the Fourteenth Amendment. Count I is dismissed with prejudice.

## II.    Count II: Title IX

Plaintiff's second remaining claim alleges Defendants are liable to Plaintiff under Title IX because when he was expelled from the University, he was "denied the

---

[5] Plaintiff states in his Amended Complaint that "the investigators did not interview Jane Roe directly." (Doc. 20 at 27). This conflicts with the investigative report Defendants proffer as an exhibit, which states that Roe not only provided a written statement but "met with investigators" on April 16, 2020. (Doc. 33-3 at 6). At the motion-to-dismiss stage, the Court must take all non-frivolous factual allegations in the operative complaint as true, and so for purposes of ruling on the instant Motion, it will assume that Plaintiff's accuser did not ever sit for an interview with investigators in real time. It is undisputed, however, that Roe provided a written statement or statements and that she cooperated with the pre-hearing investigation, at least until she informed the University on July 9, 2020, that she wished to "disengage/cease participation in the investigation process." (Doc. 33-3 at 8).

benefits of" and "subjected to discrimination under an education program or activity receiving Federal Financial assistance" on the basis of his sex. 20 U.S.C. § 1681(a). The parties agree that the University is an education program receiving federal funds within the meaning of the statute, and so the only question is whether he suffered discrimination because he is male.

In its Order dismissing Plaintiff's original Complaint, this Court reminded Plaintiff that he " 'cannot rely on . . . generalized allegations alone . . . , but must combine them with facts particular to *his* case to survive a motion to dismiss.' *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 855 (7th Cir. 2019) (emphasis in original)." (Doc. 19 at 6). Thus, a successful Title IX claim will require evidence that the plaintiff himself, in the context of the disciplinary proceeding at issue, was discriminated against because of his sex, and, without more, examples of anti-male rhetoric on campus or in society at large will not suffice. Unlike in *Purdue*, where two of the individuals hearing charges against the plaintiff admitted they decided against him without having even read the investigative report, Plaintiff here alleges only insufficiency of process and introduces no allegations of actual bias or biased procedures:

> Plaintiff's allegations regarding cross-examination and the presentation of evidence are unrelated to gender. Plaintiff does not allege females accused of sexual assault were allowed to cross-examine their accusers or present evidence differently. . . . Accepting the allegations in the Complaint as true and considering the totality of the circumstances does not allow for a plausible inference that the Subcommittee found Roe more credible because of her sex or that they reached their decision because of Plaintiff's gender.

21

(Doc. 19 at 9).[6]

Yet, despite these admonitions, Plaintiff proceeded to refile a Title IX claim that differs not one whit from the count he filed in the original Complaint, except inasmuch as he asserts it against the University's Board Members in their official capacities rather than against the Board as a body. He has altered his factual allegations relevant to this count only by *omitting* discussion of various regulatory and societal pressures that allegedly pushed the University to "make an example out of male students" like him (doc. 1 at 18)—not by *adding* any facts that might show gender bias infected the specific disciplinary proceeding at issue. Defendants are incorrect to argue (doc. 32 at 4) that they may not properly be sued under Title IX and that Plaintiff's suit fails as to this count because he did not retain the Board itself as a defendant. *Smith v. Metro. Sch. Dist. Percy Twp.*, 128 F.3d 1014, 1021 n.3 (7th Cir. 1997) ("[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity" (quoting *Nelson v. Temple Univ.*, 920 F.Supp. 633, 637

---

[6] It is worth nothing that the Seventh Circuit Court of Appeals recently affirmed, in no uncertain terms, this approach to Title IX cases:

> Coming to the wrong answer in deciding who was to blame for unwelcome events in a romantic relationship, or selecting an inappropriate response, or interviewing the wrong potential witnesses, or listening to too few or too many witnesses—these and similar matters are of no concern under federal law unless the defendants treated men worse than women (or the reverse).

*Doe v. The Trs. of Ind. Univ.*, No. 22-1576, 2024 WL 1824967, at *3 (7th Cir. Apr. 26, 2024).

(E.D. Pa. 1996).).[7] However, this entire discussion is of no consequence, because Plaintiff's Title IX count was dismissed for failure to state a claim and not because it was brought against the wrong defendants. It is again dismissed for the same reason—this time with prejudice.

### III.  Preliminary Injunction

Plaintiff also moves, again, for a preliminary injunction restoring him to his former status as a student in good standing at the University. The Court finds Plaintiff has not met the preliminary-injunction standard:

> The movant must show the existence of irreparable harm and the absence of an adequate remedy at law, a probability of ultimate success on the merits, that the threat of harm to the movant outweighs the harm that would result to the opposing party should the injunction issue, and that the public interest will not be disserved by the granting of temporary injunctive relief.

*United States v. Phillips*, 527 F. Supp. 1340, 1343 (N.D. Ill. 1981) (citation omitted).

Because Defendants' Motion to Dismiss is granted for the reasons already explained, it necessarily follows that Plaintiff has demonstrated no likelihood of success on the merits. Nor has he alleged any further and irreparable harm will befall him, nearly four years after his dismissal, if the Court does not disturb the current status quo and restore him to his long-past status as a student of the University. No preliminary injunction will issue.

### CONCLUSION

---

[7] For this reason, Plaintiff's request for leave to amend his Complaint a second time (doc. 35 at 4) is unnecessary and is denied. Plaintiff is also reminded again that motions for leave to amend are to be filed separately and not buried in a response to a different motion.

23

Defendants' Motion to Dismiss (doc. 32) is GRANTED. Plaintiff's Amended Complaint (doc. 20) is DISMISSED WITH PREJUDICE as to all claims against all Defendant Board Members. It is DISMISSED WITHOUT PREJUDICE for failure to serve as to all claims against Defendant Pritzker. Plaintiff's request for a preliminary injunction is DENIED. This matter is terminated.

SO ORDERED.

Entered this 3rd day of May 2024.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge
